**MISSION GROUP KANSAS, INC., Plaintiff,**

v.

**Richard RILEY, Secretary of the United States Department of Education, in his official capacity, Defendant.**

**Civ. A. No. 95–2382–JWL.**

United States District Court, D. Kansas.

Nov. 16, 1995.

---

Ronald L. Holt, Lisa J. Henoch, Bryan Cave, Kansas City, MO, Peter S. Leyton, Ritzert & Leyton, P.C., Fairfax, VA, for plaintiff.

Christina L. Morris, Office of United States Attorney, Kansas City, KS, for defendant.

Peter S. Leyton, Seth C. Berenzweig, Ritzert & Leyton, P.C., Fairfax, VA, for amicus curiae.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

## I. INTRODUCTION

The plaintiff, Mission Group of Kansas ("Mission"), is a not-for-profit corporation which owns and operates the Wright Business School of Lenexa ("WBS–LX"). WBS–LX was formerly operated as a for-profit institution. The defendant is the Secretary of the Department of Education. The Secretary is empowered by law and regulation to supervise and administer the federal assistance educational funds under the Higher Education Act ("HEA") (20 U.S.C. §§ 1070 et seq.).

The issue in this case is whether the Secretary has the authority to require WBS–LX, a not-for-profit which was formerly a for-profit institution, to derive at least fifteen percent of its gross tuition revenues from sources other than Title IV funds. The Secretary claims that it may lawfully impose this so-called 85/15 Rule on WBS–LX under the HEA's provisional certification statute. § 1099c(h). The Secretary has interpreted this statute as allowing the Secretary to add "any additional condition" to the program participation agreement of the institution which is being provisionally certified. 34 C.F.R. § 668.13(c)(4)(ii). Mission brought this claim for declaratory and injunctive relief against the Secretary of the Department of Education to enjoin imposition of the 85/15 Rule. Mission claims that the Secretary's imposition of the 85/15 Rule on WBS–LX, as a not-for-profit institution, violates the HEA, the Administrative Procedure Act ("APA") (5 U.S.C. §§ 701 et seq.), and the Due Process Clause of the Constitution.

The court has subject matter jurisdiction over the plaintiff's claims because this case involves a federal question. 28 U.S.C. § 1331. Venue is appropriate under 28 U.S.C. § 1391(e). A trial to the court was held on October 25, 1995. For the reasons set forth below, the court finds that the Secretary exceeded the authority conferred by the HEA. Accordingly, the Secretary is enjoined from imposing the 85/15 Rule on Mission and WBS–LX.

## II. STANDARD OF REVIEW

In determining whether the Secretary can impose the 85/15 Rule on a not-for-profit institution which acquired the assets of a formally for-profit institution by placing the 85/15 Rule in the not-for-profit institution's program participation agreement which is required for provisional certification, the court must follow the framework outlined in *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If the HEA's text is clear and unambiguous, "that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781–82. If the statute is silent or ambiguous as to the issue, however, the court must consider whether the agency's construction is reasonable. *Id.* at 843, 104 S.Ct. at 2782. "Even if an agency's interpretation is not the only one permitted by the language of the rule, courts must respect it if it is at least a reasonable interpretation." *City of Aurora v. Hunt,* 749 F.2d 1457, 1462 (10th Cir.1984).

## III. THE HIGHER EDUCATION ACT

Under the HEA, the Secretary of the Department of Education administers a number of federally guaranteed student loan and grant programs to qualified students enrolled in certain postsecondary institutions. The programs include the Federal Family Education Loan program, the Federal Pell Grant Program, and the Federal Supplemental Educational Opportunity Grant Program. To participate in these financial aid programs, the postsecondary institutions must satisfy certain eligibility and certification requirements. One of these is the 85/15 Rule.

### A. The 85/15 Rule

The HEA distinguishes between "proprietary institutions of higher education" and

"postsecondary vocational institutions." § 1088(b)–(c). Under the HEA, these terms are mutually exclusive. A proprietary institution of higher education cannot be a not-for-profit institution. Similarly, a postsecondary vocational institution must be a not-for-profit institution. *See* § 1088(b)(3) (defining a proprietary institution as one "which does not meet the requirement of clause (4) of subsection 1441(a)"); § 1088(c)(2) (defining a postsecondary vocational institution as one "which meets the requirements of clauses (1), (2), (4), and (5) of section 1141(a)"); § 1141(a)(4) (describing an entity which "is a public or other nonprofit institution").

In the 1992 amendments to the HEA, Congress enacted the 85/15 Rule. Under this rule, proprietary institutions can maintain their eligibility to participate in Title IV programs only if at least fifteen percent of their gross tuition revenues are derived from sources other than Title IV funds. The 85/15 Rule states:

> For the purpose of this section, the term "proprietary institution of higher education" means a school . . . (6) which has at least 15 percent of its revenues from sources that are not derived from funds provided under this subchapter and part C of subchapter I of chapter 34 of Title 42, as determined in accordance with regulations prescribed by the Secretary.

20 U.S.C. § 1088(b)(6).

In proposing the 85/15 Rule, Representative Maxine Waters explained the purpose of the 85/15 Rule as follows:

> [M]any proprietary vocational schools have been set up to garner large amounts of Federal student aid dollars. Practically, all of the students receive student loans and grants, and the school offers little or no attraction to people to pay their own funds to attend. In fact, we have instances of proprietary schools refusing to allow people to pay with their own money. After World War II, the Department of Veterans Affairs responded to the rise of schools which were set up to milk the veterans' educational benefits program by establishing a rule which provided that VA would not extend any GI benefits to courses in which more than 85 percent of

the students have their fees paid by VA. A similar rule should apply to the proprietary schools.

Cong.Rec. H1911 (March 26, 1992). The Secretary similarly discussed the goal of the 85/15 Rule:

> [T]he purpose of the [85/15 Rule] is to require proprietary institutions to attract students based upon the quality of their programs, not solely because the institutions offered Federal student financial assistance. Thus, under the statute, these institutions must attract students who will pay for their programs with funds other than Title IV, HEA program funds.

59 Fed.Reg. 6448 (Feb. 10, 1994). Thus, the 85/15 Rule was intended to ensure that for-profit vocational schools would have to compete for federal student aid dollars by offering quality education that students with private funds would be willing to buy with their own money.

The application of the 85/15 Rule to proprietary institutions has been upheld in *Ponce Paramedical College v. United States Department of Education,* 858 F.Supp. 303 (D.P.R.1994) and *Career College Association v. Riley,* 70 F.3d 637 (D.C.Cir.1995). The plaintiff does not dispute that the 85/15 Rule would apply to WBS–LX if it were a for-profit institution. Instead, Mission contends the Secretary cannot impose the 85/15 Rule on WBS–LX because it is no longer a for-profit institution and is now being operated as a not-for-profit institution. By definition, Mission argues, the 85/15 Rule only applies to for-profit institutions. In response, the Secretary claims the authority to impose the 85/15 Rule on WBS–LX via WBS–LX's provisional certification and program participation agreement.

### B. Imposition of the 85/15 Rule Via Provisional Certification and Program Participation Agreements

The 1992 HEA Amendments stressed the Secretary's responsibility of being a "gatekeeper." The Senate summarized this goal by stating:

> Restoring public confidence in student financial aid programs is one of the most

serious challenges we face in this reauthorization. The integrity of Title IV programs has been harmed immeasurably by persistent reports of fraud and abusive actions by schools and other program participants, especially in the Stafford loan program where profit incentives are great. Senate Report 102–204, at 3 (Nov. 12, 1991). In addition, the Senate stressed that the Department should "undertake strong enforcement of the law and make full use of the authorities provided under it." *Id.* at 46. The Secretary argues that this gatekeeping responsibility includes imposing restrictions to prevent schools from circumventing the 85/15 Rule by simply converting from a for-profit to a not-for-profit institution. Specifically, the Secretary seeks to impose the 85/15 Rule on not-for-profit institutions which were formerly for-profit institutions via its provisional certification and program participation agreement.

The 1992 HEA Amendments specifically addressed institutions which undergo a "change of ownership resulting in a change of control" by providing a nonexclusive list of what constitutes change in ownership. *See* § 1099c(i)(2). Under the HEA regulations, the Secretary considers such a change to include a "conversion of the institution from a for-profit to a nonprofit institution." 34 C.F.R. § 600.31(d)(7). The Secretary also considers a "transfer of assets that comprise a substantial portion of the educational business of the institution" to be a change in ownership. § 600.31(d)(6).[1]

Under the HEA, any institution that undergoes a "change of ownership which results in change of control" cannot participate in HEA programs unless the institution meets certain eligibility requirements. § 1099c(i)(1). The HEA regulations provide that any institution undergoing a change of ownership temporarily "ceases to qualify as an eligible institution upon the change of ownership and control" and must "reestablish eligibility" demonstrating that the school still meets all HEA eligibility requirements. 34 C.F.R. § 600.31(a)(1)–(2).

In order to minimize the period of time during which an institution would be ineligible for financial aid, the 1992 amendments to the HEA authorized the Department to "provisionally certify" schools when a school undergoes a change in ownership. *See* H.Rep. 447, 102d Cong., 2d Sess. 76 (1992), U.S.Code Cong. & Admin.News 1992 at 334, 407. The HEA provides:

> [T]he Secretary may provisionally certify an institution's eligibility to participate in programs under this subchapter and part C of subchapter I of chapter 34 of Title 42 ... for not more than 3 complete award years if ... there is a complete or partial change of ownership, as defined under subsection (i) of this section, of an eligible institution.

20 U.S.C. § 1099c(h)(1)(B)(ii). In 1994, The Secretary issued a regulation defining provisional certification as permitting the Secretary to add "any additional condition" as part of the certification:

> '[P]rovisional certification' means that the Secretary certifies that an institution has demonstrated to the Secretary's satisfaction that the institution ... [i]s able to meet the institution's responsibilities under its program participation agreement, including compliance with *any additional conditions* specified in the institution's program participation agreement that the Secretary requires the institution to meet in order for the institution to participate under provisional certification.

34 C.F.R. § 668.13(c)(4)(ii) (emphasis added). Similarly, the Secretary issued a regulation allowing the Secretary to add "any additional condition" to an institution's program participation agreement. The regulation states:

> A program participation agreement conditions the initial and continued participation of an eligible institution in any Title IV, HEA program upon compliance with the provisions of this part, the individual program regulations, and *any additional conditions* specified in the program participation agreement that the Secretary requires the institution to meet.

---

**1.** In this lawsuit, Mission is not challenging the Secretary's interpretation of what constitutes a change in ownership under these regulations and acknowledges that Mission's acquisition of WBS–LX constitutes a change of ownership under the HEA.

§ 668.14(a)(1) (emphasis added). Under the authority of these regulations, the Secretary claims the power to impose the 85/15 Rule as an "additional condition" on not-for-profit institutions undergoing changes in ownership like WBS–LX. The Secretary explained this view when the final regulations regarding the 1992 HEA Amendments were implemented:

The Secretary recognizes that institutions that change from for-profit to non-profit status may well retain the very same faculty, management, programs and facilities. The very fact that the institution retains these characteristics through the conversion, however, points out the logic of ensuring that section 498(i) [regarding "Treatment of Change of Ownership," 20 U.S.C. § 1099c(i) ] be applied to these conversions in a way that is consistent with congressional intent to impose a range of precautions and restriction on for-profit vocational schools.

Based on the strong Congressional intent evidenced in these statutory changes to restrict title IV, HEA program participation by proprietary trade schools, the Secretary considers it reasonable to treat changes in business form by such institutions to a status to which those restrictions do not necessarily apply as significant changes warranting the same scrutiny section 498(i) of the HEA dictates for other, perhaps far less consequential changes in governance by schools. Moreover, a change from taxable to nonprofit, tax-exempt status contains sufficient elements of a change in ownership and control to fall within the scope of section 498(i). . . .

Therefore, although a corporation may affect the change in form from taxable to tax-exempt, nonprofit status with little formality, and may not be required, under local law, to reconstitute itself as a new or different corporation, these consequences of the change make it a change cognizable under section 498(i) of the HEA.

The Secretary is charged by section 498(h)(1)(B)(ii) of the HEA with provisionally certifying institutions that undergo a change of ownership and control. Provisional certification means, as the Depart-ment has spelled out in proposed § 668.13(c)(4)(ii), 59 Fed.Reg. 9564, certification subject to conditions, and the change from for-profit to nonprofit status warrants adopting as those conditions of the required provisional certification those restrictions that would have applied to the institution had it remained a for-profit entity. The Secretary therefore expects to include such provisions for a limited period in certifications given to converting schools.

59 Fed.Reg. 22,333–34 (1994). Thus, the Secretary argues the right to impose the 85/15 Rule on WBS–LX, a restriction that would have applied had the institution remained a for-profit entity.

## IV. FACTS

This case involves primarily a legal issue concerning facts which are virtually undisputed.[2] Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the court makes the following finding of facts.

Professional Training Institute, Inc., ("PTI") is a for-profit corporation which is owned entirely by James Miller. PTI has four directors on its board: John Mucci, his wife Gail Mucci, James Miller, and James Coyt. PTI owns Wright of Kansas City, Inc., and Wright of Oklahoma City, Inc., both for-profit institutions. At the present time, Wright of Kansas City, Inc., and Wright of Oklahoma City, Inc., do not generate any revenues and do not provide any services to anyone.

Prior to this year, Wright of Kansas City, Inc., owned and operated WBS–LX and a branch campus called Wright Business School of Kansas City, Missouri ("WBS–KC"). During this same time, Wright of Oklahoma City, Inc., owned and operated Wright Business School of Oklahoma City ("WBS–OK").

In March of 1992, Representative Maxine Waters proposed the 85/15 Rule as an amendment to the Higher Education Act. Originally, the 85/15 Rule was to take effect of September 30, 1994. Because of a one-year Congressional moratorium adopted in

---

**2.** Nevertheless, the plaintiff felt compelled to present a full day of factual testimony at trial.

the fall of 1994, however, the 85/15 Rule did not become effective until July 1, 1995. Nevertheless, Mr. Miller and Mr. Mucci both understood that, as for-profit institutions, the three Wright Business Schools would be subject to the 85/15 Rule when it took effect. Mr. Miller and Mr. Mucci also knew that because the schools received nearly all of their revenues from federal student financial aid funds, the schools would lose their Title IV eligibility if they remained for-profit institutions.

To avoid imposition of the 85/15 Rule on the Wright Business Schools, Mr. Miller and Mr. Mucci formed Mission, a not-for-profit corporation which would eventually acquire the various Wright Business Schools.[3] Mission was incorporated as a Kansas corporation on June 21, 1994. As with PTI, Mission has four directors on its board: John Mucci, his wife Gail Mucci, James Miller, and James Coyt.

Mission entered into an agreement to purchase WBS–LX from PTI and Wright of Kansas City, Inc., on July 19, 1994. On July 19, 1994, Mission submitted an application for tax-exempt status as a charitable organization. On August 24, 1994, Mission asked the IRS to expedite processing of its application in order to avoid imposition of the 85/15 Rule. Mission finally received IRS approval as a tax-exempt entity on December 12, 1994. Mission acquired ownership of WBS–LX on March 3, 1995.

Meanwhile, in early 1995, WBS–LX's branch campus, WBS–KC decided to close because of economic problems. At WBS–KC's request, the Department of Education allowed WBS–OKC to conduct a "teach-out" of the remaining students at WBS–KC. Under this teach-out arrangement, WBS–OKC added the WBS–KC campus as a temporary learning site where instruction of existing WBS–KC students was completed.

Prior to Mission's acquisition of WBS–LX on March 3, 1995, representatives of WBS–LX contacted the Institutional Participation Division of the Office of Postsecondary Education ("IPD") to seek guidance on Mission's acquisition of WBS–LX. On March 14, 1995, WBS–LX representatives completed an application for approval of Mission's acquisition of WBS–LX and for recertification of Title IV eligibility of WBS–LX as a not-for-profit postsecondary vocational institution. During a meeting between IPD and WBS–LX representatives to discuss WBS–LX's application for recertification of eligibility as a new not-for-profit postsecondary vocational institution, none of the IPD representatives suggested that the Department would impose for-profit requirements on WBS–LX.

On May 4, 1995, Mission received written approval of Title IV eligibility for WBS–LX upon receiving a letter which classified WBS–LX as a "Postsecondary Vocational Institution under section 481(c) of the Higher Education Act of 1965." Mr. Mucci, vice president of Mission, immediately met with the IPD in order to sign a new program participation agreement for WBS–LX and to establish Title IV eligibility. The program participation agreement contained a clause requiring WBS–LX to satisfy the so-called 85/15 Rule. The clause stated:

> The Institution must meet all restrictions that would have applied to the Institution if it has [sic] remained a for-profit entity, including but not limited to, having no more than 85 percent of its revenues de-

3. The plaintiff presented lengthy evidence suggesting that Mr. Miller and Mr. Mucci began planning for the creation of a not-for-profit entity long before Congress adopted the 85/15 Rule. First, Mr. Miller testified that in 1991 he began considering not-for-profit status for the Wright Business Schools because this would be conducive to establishing schools abroad in countries like Hungary and Indonesia. The plaintiff also introduced an affidavit of Chadwick Gore which corroborated Mr. Miller's story. Yet, the plaintiff presented no other credible evidence indicating that Mission had taken any action in establishing schools abroad, other than obtaining not-for-profit status. Therefore, the court finds that Mission was not formed for this purpose. Second, Mr. Miller testified he began considering not-for-profit status of the Wright Business Schools because this would help facilitate his life-long dream of helping the disabled and the handicapped. Interestingly, the plaintiff could only identify a handful of handicapped people who had attended the Wright Business Schools. The court was not persuaded by this testimony and finds that Mission was not formed for such a purpose. Instead, the court finds that Mission was formed *solely* to avoid the 85/15 Rule.

rived from Title IV, HEA program funds, as determined under paragraph (d) of 34 CFR 600.5.

Under protest, Mr. Mucci signed the program participation agreement with the understanding that the school would later challenge the applicability of the 85/15 Rule to WBS–LX. From May to August of 1995, Mr. Mucci and Robert Jamroz, the acting director of the IPD, exchanged a number of letters explaining their respective positions on the imposition of the 85/15 Rule on WBS–LX.

In May of 1995, the Department sent all for-profit institutions a "Dear Colleague" letter stating that the Secretary would begin enforcing the 85/15 Rule as of July 1, 1995. The Department also requested that by July 10, 1995, all proprietary institutions with fiscal years ending on December 31, 1995, file a statement with the Department stating whether they were in compliance with the 85/15 Rule for their most recently completed fiscal year. Upon receiving this letter, WBS–OKC, still a for-profit institution, understood that it would not be in compliance with the so-called 85/15 Rule. To keep WBS–KC and WBS–OKC eligible for federal financial aid, WBS–LX, now owned by Mission, received the Department's approval to conduct a teach-out of the existing WBS–KC and WBS–OKC students at WBS–LX. In addition, WBS–LX received the Department's approval to add WBS–OKC as an additional permanent location of WBS–LX.

On August 15, 1995, the Department of Education sent Mission an addendum to its program participation agreement. The addendum eliminated all for-profit restrictions on Mission except for the 85/15 Rule.

On August 29, 1995, Mission brought this claim for declaratory and injunctive relief against the Secretary of the Department of Education to enjoin imposition of the 85/15 Rule. Mission claims that the Secretary's imposition of the 85/15 Rule on WBS–LX, as a not-for-profit institution, violates the Higher Education Act of 1965 ("HEA") (20 U.S.C. §§ 1070 et seq.), the Administrative Procedure Act ("APA") (5 U.S.C. §§ 701 et seq.), and the Due Process Clause of the Constitution.

## V. CONCLUSIONS OF LAW

Despite the lengthy factual evidence presented at trial, the issue in this case is primarily a question of law. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the court makes the following conclusions of law.

■ Under *Chevron,* the court must first look to the plain language of the HEA to determine if the Secretary has the power to impose the 85/15 Rule on not-for-profit institutions which were once for-profit institutions as part of the provisional certification procedure. The Secretary does not dispute that Mission owns and operates WBS–LX as a not-for-profit entity for tax purposes. In fact, on May 4, 1995, the Secretary classified WBS–LX as a "post-secondary vocational institution"—a term that clearly refers to not-for-profit institutions. *See* § 1088(c); § 1141(a)(4). Under the express language of the statute, the 85/15 Rule only applies to proprietary institutions, which are by definition for-profit. *See* § 1088(b); § 1141(a)(4). Accordingly, the court concludes that the Secretary's imposition of the 85/15 Rule on WBS–LX, a not-for-profit institution, contravenes the plain language of the statute.

The fact that WBS–LX was previously operated as a for-profit institution does not alter this analysis. Under the HEA, the Secretary can provisionally certify institutions which undergo a change in ownership as part of the Secretary's gatekeeping responsibility. § 1099c(h)(1)(B)(ii). However, the Secretary's regulations defining provisional certification as permitting the Secretary to add "any additional condition" to the institution's program participation agreement clearly violate the express language of the HEA. *See* 34 C.F.R. §§ 668.13(c)(4)(ii), 668.14(a)(1). The HEA expressly states that such institutions undergoing changes of ownership must comply with section 1088:

"An eligible institution of higher education that has had a change in ownership resulting in a change of control shall not qualify to participate in programs under this subchapter and part C of subchapter I of chapter 34 of Title 42 after the change in

control (except as provided in paragraph (3)) *unless it establishes that it meets the requirements of section 1088 of this title* (other than the requirements in subsections b(5) (and (c)(3))) and this section after such change in control."

§ 1099c(i)(1). As stated previously, to meet the definitional requirements of section 1088, the 85/15 Rule cannot be imposed on not-for-profit post-secondary vocational institutions like WBS–LX. Therefore, the court concludes that the Secretary's imposition of the 85/15 Rule on WBS–LX via the provisional certification statute violates the plain language of the HEA.[4]

[redacted] The express language of the program participation statute also indicates that the 85/15 Rule cannot be imposed on not-for-profit institutions which were formerly for-profit. Section 1094(a) delineates twenty-two provisions and conditions to be included in an institution's program participation agreement. With respect to an "institution of higher education which changes ownership," the statute only requires a provision in the program participation agreement regarding development of a Default Management Plan. § 1094(a)(14)(B). Nothing in section 1094 authorizes the Secretary to modify an institution's substantive eligibility requirements, such as the 85/15 Rule, in the program participation agreement. In fact, the statute states that "the term *'eligible institution'* means any such *institution described in section 1088 of this title.*" § 1094(d) (emphasis added). Again, the court concludes that to meet the definitions of section 1088, the 85/15 Rule cannot be imposed on not-for-profit post-secondary vocational institutions like WBS–LX via its program participation agreement.

In sum, the HEA unambiguously defines an institution's substantive eligibility requirements for HEA funds. The HEA only requires that for-profit institutions comply with the 85/15 Rule. The Secretary argues that the Secretary has the authority to impose the 85/15 Rule on WBS–LX as part of its general gatekeeping authority in the provisional certification and program participation agreement regulations. While the regulations do allow the Secretary to impose "any additional conditions" in an institution's program participation agreement, such broad language suggests that all institutions undergoing a change of ownership are at the mercy of the Secretary. Yet, nothing in the HEA remotely authorizes the Secretary to modify an institution's substantive eligibility requirements. On the contrary, section 1088 defines the substantive eligibility requirements for both full and provisional certification. Section 1088 only requires that for-profit institutions comply with the 85/15 Rule. Therefore, the court concludes that the Secretary's imposition of the 85/15 Rule on not-for-profit institution is contrary to the plain language of the HEA.

4. The Department, itself, has even questioned its authority to impose the 85/15 Rule on not-for-profit institutions which were formally for-profit. David Longanecker, Assistant Secretary for Post Secondary Education appeared before a Senate Subcommittee where the following conversation ensued:

*Senator Nunn: Are you going to guard against* people switching from profit to non-profit and basically then paying themselves all the salaries—you know, a nonprofit can eat up all the salary.

Longanecker: Yes, and that is a tough—again, you know, all of these are balancing issues. There are times when it is appropriate for an institution to change its stature. What we have proposed is that when they change from for-profit to nonprofit that we put them on provisional certification, and that for a period of three years they remain treated as though they were a for-profit institution so that we can see that they *just aren't a sheep in wool's [sic] clothing.*

Senator Nunn: You are going to do that as part of a legislative change?

Longanecker: Or a wolf in sheep's clothing. I got that backwards, I guess.

Senator Nunn: Can you do that in a regulation?

Longanecker: No, we can't do that in a regulation. We will need some help on that.

Longanecker: Actually we have done that in regulation. We may need some help from you because there is some question. That is an area where a number of Congress people have raised *some concerns about whether we have the regu*latory ability to do that. We did in regulation. We believe we do. If it is challenged, we may need some help.

Transcript of Proceedings on July 12, 1995, of the United States Senate Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, at 93–94.

844

■ Even if the HEA were somehow viewed to be ambiguous as to the issue in this case, the court concludes that the Secretary's position cannot be upheld. The Secretary's principal means of imposing the 85/15 Rule on WBS–LX is through a comment to the final regulations. In essence, the Secretary's imposition of the 85/15 Rule on not-for-profit institutions is purely an interpretive rule—one that reflects the Secretary's general policy and does not have the force and effect of law. In discussing the degree of deference required in such circumstances, the Tenth Circuit stated in *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272 (10th Cir.1994):

> The comment, however, provides only the weakest support for [the agency's] position. In the first place, it is a purely interpretive rule, unpromulgated under the Administrative Procedure Act, see 5 U.S.C. § 553(b)(3)(A), and added here by [the agency] only to help clarify the meaning and application of the various promulgated rules that follow it.... Consequently, while it may be entitled to some consideration in our analysis, it does not carry the force of law and we are in no way bound to afford it any special deference under *Chevron.*

In accordance with *Headrick,* the court concludes that the Secretary is entitled to no deference under *Chevron.* As such, the Secretary's imposition of the 85/15 Rule on Mission is not lawful.

While the court concludes that the Secretary should be enjoined from imposing the 85/15 Rule as a matter of statutory interpretation, the court notes that the policy arguments for imposing the 85/15 Rule on institutions like WBS–LX have much merit. At trial, Dr. Robert Jamroz, Acting Director of the IPD, expanded on the abuses present in the federal student aid system caused by the HEA's eligibility requirements. Most educational institutions, like WBS–LX, receive large amounts of HEA funds from their students. Any institution, whether for-profit or not-for-profit, can abuse the system by using this federal money to pay its executives and faculty six-figure salaries. In addition, for-profit institutions are able to pay profits derived from federal funds directly to share-

holders. As a result, most of the HEA abuses have historically come from for-profit institutions where, by their very nature, the incentive to make money is the greatest. Unfortunately, the IPD has neither the time nor the money to police every institution to determine whether it qualifies for large amounts of HEA funds. As a result, the 85/15 Rule provides the IPD with a crude measuring stick to guard against abuses by schools where such abuses have historically been the greatest, for-profit institutions. Moreover, by imposing the 85/15 Rule during the institution provisional certification period, the Secretary can evaluate whether the institution is truly operating consistently with its new charitable purposes and is worthy of HEA funds. As the court points out, however, the problem is that the Secretary simply lacks the authority to impose the 85/15 Rule under the current version of the HEA.

## VI. CONCLUSION

Under *Chevron,* Mission's request to enjoin imposition of the 85/15 Rule must be granted. Given the express language of the statute, the Secretary cannot impose the 85/15 Rule on not-for-profit institutions which were formerly for-profit institutions via provisional certification.

**IT IS THEREFORE ORDERED BY THE COURT** that the plaintiff's claims for relief are hereby **GRANTED.** The court declares that the Secretary has exceeded the authority under the Higher Education Act by imposing the 85/15 Rule on Mission and WBS–LX. Accordingly, the defendant is enjoined from using the provisional certification process to impose the 85/15 Rule on Mission and WBS–LX. The defendant is also ordered to remove the 85/15 Rule from the program participation agreement for Mission and WBS–LX. To the extent the plaintiff seeks attorney's fees under the Equal Access to Justice Act, it may avail itself of the procedures set out in D.Kan.Rule 54.2.

**IT IS SO ORDERED.**