**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 1 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

MISSION GROUP KANSAS, INC.,

      Plaintiff - Appellee,

v.

RICHARD RILEY, Secretary of the
United States Department of
Education, in his official capacity,

      Defendant - Appellant.

No. 96-3025

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 95-CV-2382)**

---

Frank A. Rosenfeld (William Kanter with him on the brief), United States
Department of Justice, Washington, D.C. for the Defendant - Appellant.

Ronald L. Holt (Daniel R. Young with him on the brief), Bryan Cave, LLP,
Kansas City, MO for the Plaintiff - Appellee.

---

Before **LUCERO**, **MCWILLIAMS** and **MURPHY**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

In 1992, Congress amended the Higher Education Act of 1965 ("HEA"), see 20 U.S.C. §§ 1001-1146a, to improve the financial accountability and integrity of postsecondary educational institutions in receipt of federally-funded student financial aid provided under Title IV of that Act. See H.R. Rep. No. 102-447, at 10 (1992), reprinted in 1992 U.S.C.C.A.N. 334, 343. As a result of those amendments, for-profit postsecondary institutions are statutorily barred from participating in Title IV programs unless they derive at least 15% of their gross revenues from sources other than Title IV. See 20 U.S.C. § 1088(b)(6). Non-profit schools, however, are not statutorily required to comply with this so-called "85/15 rule."

Mission Group Kansas, Inc. ("Mission"), the appellee before us today, was established in 1994 as a non-profit educational institution. When it took over a number of for-profit business schools to convert them to non-profit status, the Secretary of Education refused to exempt Mission's schools from the 85/15 rule. Instead, he has conditioned their receipt of Title IV funds on their complying with the 85/15 rule for a provisional period—despite Mission's non-profit status. See Appellant's App. at 84. The questions before us are what level of deference is due an agency's interpretation of its own regulations and is the Secretary's decision to impose the 85/15 rule entitled to such deference.

## I

## A

Prior to Mission's formation, its founders owned a for-profit corporation, Professional Training Institute, Inc. ("PTI"), which in turn owned three business schools, each named Wright Business School. The schools were located in Oklahoma City; Lenexa, Kansas; and Kansas City, Missouri. After Congress passed the 1992 amendments, PTI's directors realized that the Wright Schools would shortly become subject to the 85/15 rule. For the sole purpose of avoiding the application of that rule, see Appellant's App. at 122, they formed a non-profit, Mission Group Kansas, Inc., and transferred ownership of the schools from PTI to Mission.

After Mission acquired ownership of the Lenexa school in March 1995, it applied to the Department of Education, seeking to participate in Title IV student financial aid programs. The Department prepared a new program participation agreement for the Lenexa school, see 20 U.S.C. § 1094(a) (describing nature and requirements of program participation agreements), mandating compliance with the 85/15 rule, and which Mission was required to accept in order to obtain the Secretary's provisional certification for Title IV participation. See 34 C.F.R. § 668.13(c)(4)(ii). Mission signed under protest, reserving the right to challenge the incorporation of the 85/15 rule into the program participation agreement and

- 3 -

provisional certification process. Shortly thereafter, the Lenexa school took over the Kansas City and Oklahoma City schools, and Mission filed the present action claiming that the Secretary's imposition of the 85/15 rule violates the Administrative Procedure Act, the HEA, and Mission's constitutional right to due process.

**B**

When a school changes ownership, "the Secretary may provisionally certify [the] institution's eligibility to participate in programs under [Title IV] . . . for not more than 3 complete award years . . . ." 20 U.S.C. § 1099c(h)(1)(B)(ii). Mission concedes the shift from profit to non-profit status is a change in ownership, triggering the need for provisional certification. See 34 C.F.R. § 600.31(d)(7). According to the applicable regulations:

> "Provisional certification" means that the Secretary certifies that an institution has demonstrated to the Secretary's satisfaction that the institution . . . [i]s able to meet the institution's responsibilities under its program participation agreement, including compliance with any additional conditions specified in the institution's program participation agreement that the Secretary requires the institution to meet in order for the institution to participate under provisional certification.

34 C.F.R. § 668.13(c)(4)(ii) (emphasis added).

All institutions receiving Title IV funds are required to enter into "program participation agreement[s]" that state the terms of their "initial and continued eligibility . . . to participate in a [Title IV] program." 20 U.S.C. § 1094(a).

- 4 -

Again, Mission concedes that it was required to enter into a new program participation agreement as a result of the shift to non-profit status. See 34 C.F.R. § 668.14(h)(1). Paralleling the requirements for provisional certification, see 34 C.F.R. § 668.13(c)(4)(ii), a program participation agreement

> conditions the initial and continued participation of an eligible institution in any Title IV, HEA program upon compliance with the provisions of this part, the individual program regulations, and any additional conditions specified in the program participation agreement that the Secretary requires the institution to meet.

34 C.F.R. § 668.14(a)(1) (emphasis added). It is on the basis of the "any additional condition" language contained in 34 C.F.R. § 668.13(c)(4)(ii) and 34 C.F.R. § 668.14(a)(1) that the Secretary would require Mission's compliance with the 85/15 rule. And it is this reliance that Mission insists is beyond the Secretary's statutory authority.

## C

After a bench trial, the district court agreed with Mission that the Secretary's action contravened the plain language of the HEA, and granted the requested declaratory and injunctive relief against imposition of the 85/15 rule. The government appeals, arguing that the Secretary has several sources of statutory authority sufficient to justify imposition of the 85/15 rule against a non-profit like Mission. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and reverse.

## II

The district court reviewed the Secretary's action under the framework enunciated in <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984). Under that framework, "[f]irst, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Chevron</u>, 467 U.S. at 842-43. On the basis of this first <u>Chevron</u> step, the district court invalidated the Secretary's action as beyond his authorization under the HEA. <u>See</u> <u>Mission Group Kansas, Inc. v. Riley</u>, 909 F. Supp. 835, 842 (D. Kan. 1995). There are two errors in this analysis.

### A. Plain Meaning

The district court ruled that imposition of the 85/15 rule on Mission's non-profit schools was contrary to the "express language of the statute, [under which] the 85/15 Rule only applies to proprietary institutions." <u>Id.</u> at 842 (citing 20 U.S.C. §§ 1088(b) & 1141(a)(4)). We disagree. Even were we to accept the district court's contention that 20 U.S.C. § 1088 "defines the substantive eligibility requirements for both full and provisional certification" of non-profit educational institutions such as Mission, <u>id.</u> at 843, we still could not agree that

Mission's compliance with those minimum eligibility requirements mandates the Secretary's certification. Eligibility is not entitlement.

The plain language of 20 U.S.C. §§ 1088(b) and 1088(c) distinguishes between "proprietary institution[s] of higher education" and "postsecondary vocational institution[s]." The two terms are mutually exclusive: a "proprietary institution of higher education" cannot be "a public or other non-profit institution," see 20 U.S.C. § 1088(b)(3) (incorporating by reference § 1141(a)(4)), whereas a "postsecondary vocational institution" must be, see 20 U.S.C. § 1088(c)(2) (incorporating by reference § 1141(a)(4)). Beyond that, in order to be a proprietary institution of higher education, a school must satisfy a number of conditions, the last of which is compliance with the 85/15 rule. See 20 U.S.C. § 1088(b)(6). In contrast, there is no requirement that a postsecondary vocational institution comply with that rule. The listed conditions simply do not mention it. See § 1088(c); see also 20 U.S.C. §§ 1141(a)(1)-(2), 1141(a)(4)-(5) (stating requirements incorporated by reference at § 1088(c)(2)).

Consequently, we are unable to discern the plain meaning identified by the district court. Section 1088 makes only two express statements about the 85/15 rule: first, a school not in compliance with that rule cannot be a proprietary institution of higher education; second, the determination of whether a school is eligible to apply as a postsecondary vocational institution to participate in Title

IV programs shall not be based on its compliance with the 85/15 rule.[1] The statute is silent on whether a postsecondary vocational institution may be subjected to the rule as an added condition of its participation. Consequently, imposing such a rule against a non-profit does not contravene the general presumption "that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." BFP v. Resolution Trust Corp., 511 U.S. 531, 537 (1994) (quoting Chicago v. Environmental Defense Fund, 511 U.S. 328, 338 (1994)) (cited in Appellee's Br. at 13). Furthermore, we see no reason stated in the statute why the inclusion of postsecondary vocational institutions within the statutory definition of the term, "institution of higher education," see § 1088(a)(1)(B), should make vocational institutions entitled, without more, to participate in Title IV programs. Standing alone, § 1088 does not plainly indicate that the Secretary is without authority to impose the 85/15 rule against a non-profit such as Mission in addition to the minimum eligibility requirements.

The plain language of the statute's provisional certification and program participation provisions does not mandate a different result. Contrary to the district court's view, 20 U.S.C. § 1099c(i)(1) does not plainly contravene the

---

[1] We note that the Secretary did find that Mission met the definition of an eligible postsecondary vocational institution under § 1088(c). See Appellee's Br., tab. B, Plaintiff's Ex. 10, at 1.

Secretary's action in this case. That provision states only that an eligible institution undergoing a change in ownership "shall not qualify to participate" in Title IV programs "unless it establishes that it meets the requirements of section 1088 of this title . . . after such change in control." 20 U.S.C. § 1099c(i)(1). This plainly states only a necessary—rather than a sufficient—condition of participation.

The same is true of 20 U.S.C. § 1094(a), which prescribes the contents of program participation agreements. Though an institution of higher education must comply with these statutorily-stated prescriptions in order to establish its "initial and continuing eligibility" to participate in Title IV programs, see 20 U.S.C. § 1094(a), that does not mean that compliance confers entitlement to participate in such programs, nor that program participation agreements can only include the conditions listed in 20 U.S.C. §§ 1094(a)(1) through 1094(a)(22). Simply put, neither § 1099c nor § 1094(a) expressly prohibits the Secretary from conditioning Mission's Title IV participation on compliance with the 85/15 rule.

The District of Columbia Circuit has recently come to a closely analogous conclusion in Career College Ass'n v. Riley, 74 F.3d 1265, 1272-74 (D.C. Cir. 1996). In that case, the court was presented with a challenge to the regulatory "Cohort Default Rate Rule," which states that an institution of higher education will be deemed "administratively incapable" of adequately administering Title IV

programs if, for <u>any</u> of the three most recent fiscal years, more than 25% of the students in any given award year have defaulted on federally insured loans. <u>See</u> <u>id.</u> at 1273. The rule was promulgated pursuant to 20 U.S.C. § 1094(c), which, among other things, authorizes the Secretary to "'establish[] reasonable standards of financial responsibility and appropriate institutional capability for the administration by an eligible institution of [Title IV programs].'" <u>See</u> <u>id.</u> at 1273 (quoting 20 U.S.C. § 1094(c)(1)(B)). The <u>Career College</u> plaintiffs argued that the rule conflicted with the statutory eligibility requirements for participation in Title IV programs, which state in part that an institution of higher education may not participate in such programs if, for <u>each</u> of the three most recent fiscal years, more than 25% of the students in any given award year have defaulted on federally insured loans. <u>See</u> <u>id.</u> at 1272-73 (citing 20 U.S.C. § 1085(a)(2)). The court rejected this claim principally on the grounds that the "statutory structure indicates that 'eligibility' is not synonymous with 'administrative capability.'" <u>Id.</u> at 1274. <u>Career College</u> therefore stands squarely for the proposition that the statute's threshold eligibility requirements do not exhaustively list the criteria that an institution must satisfy in order to participate in Title IV programs.

## B. Standard of Review

The district court's second error was to rely only on <u>Chevron</u> in its evaluation of the Secretary's action. To justify its action against Mission, the

- 10 -

government has consistently placed reliance on both 34 C.F.R. §§ 668.13(c)(4)(ii) and 668.14(a)(1). [2] Thus, in imposing the 85/15 rule against Mission, the Secretary appears to have done no more than follow his own interpretation of the Department's regulations, an interpretation clearly stated in the Federal Register. See 59 Fed. Reg. 22,333-34 (1994). Where an agency purports to act pursuant to an interpretation of its own regulations, the court should generally undertake a two-step review of the government's action to determine whether it was statutorily authorized.

First, "provided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Stinson v. United States , 508 U.S. 36, 45 (1993) (quoting Bowles v. Seminole Rock & Sand

_____

[2] The Secretary's reliance on 34 C.F.R. § 668.13(c)(4)(ii), the provisional certification regulation, is more explicit than his reliance on 34 C.F.R. § 668.14(a)(1), the program participation agreement regulation. But we have little doubt that the Secretary's express invocation of § 668.13(c)(4)(ii) effectively referenced § 668.14(a)(1). Where the former allows the Secretary to limit provisional certification for participation in Title IV programs to cases in which the institution has accepted "any additional conditions specified in the institution's program participation agreement," § 668.13(c)(4)(ii), the Secretary claims precisely the same authority in the latter to condition participation in Title IV programs on an institution's accepting "any additional conditions specified in the program participation agreement," § 668.14(a)(1). Mission itself apparently has no doubts on the matter, and refers to the two regulatory provisions as "counterpart[s]." See Appellee's Br. at 20.

Co., 325 U.S. 410, 414 (1945)).  [3] But Seminole Rock review only establishes that the agency's administrative action is a permissible construction of its own regulatory authority; it does not establish that that regulation, as interpreted, is statutorily authorized.  See Seminole Rock, 325 U.S. at 418-19 (noting that in holding administrative interpretation of regulation controlling, "[w]e do not, of

[3]  Some authorities suggest that—at least as used in Stinson—"plainly erroneous" means "flatly inconsistent with a legislative rule, a statute, or the Constitution."  See Kenneth Culp Davis & Richard J. Pierce, Jr., I Administrative Law Treatise § 6.10, at 284 (3d ed. 1994) ("Davis & Pierce").  On that interpretation, Stinson "eliminate[s] all judicial power to reject an agency's interpretation of its own rules through application of any version of the arbitrary and capricious test."  Id. at 284-85.  But the weight of authority indicates that an agency's interpretation of its own regulations is subject to challenge under 5 U.S.C. § 706(2)(A) for being arbitrary, capricious, or an abuse of discretion.  See Allentown Mack Sales & Serv., Inc. v. NLRB, 118 S. Ct. 818, 828 (1998) (holding that § 706(2)(A) governs substantive review of agency's interpretation of its own regulations); Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 150-51 (1991) (reviewing agency's interpretation of regulations for "reasonableness"); Edwards v. Califano, 619 F.2d 865, 868 (10th Cir. 1980) (holding that acknowledged deference to agency's interpretation of own regulation does not preclude review under § 706(2)(A)); see also Robert A. Anthony, The Supreme Court and the APA, 10 Admin. L.J. Am. U. 1, 5 (Spring 1996) (noting that unless "plainly erroneous" as used in Seminole Rock "embraces reasonableness component . . . it is hard to conceive a meaning for that phrase that is not already comprehended in the 'inconsistent' test").

"'Review under [§ 706(2)(A)] provokes inquiry [into] whether the administrative decisions were based on a consideration of all the relevant factors and whether there was a clear error of judgment.'"  Edwards, 619 F.2d at 868 (quoting Sabin v. Butz, 515 F.2d 1061, 1066-67 (10th Cir. 1975) (citing Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971))).  "The court's function is exhausted where a rational basis is found for the agency action taken."  Id.

There are some exceptions to the rule of Seminole Rock deference.  For example, when an agency's interpretation of its own regulation is based not on its expertise in a particular field but on general common law principles, it is not entitled to great deference. See Jicarilla Apache Tribe v. Federal Energy Regulatory Comm'n, 578 F.2d 289, 292-93 (10th Cir. 1978).

course, reach any question here to the constitutional or <u>statutory validity</u> of the regulation as we have construed it" (emphasis added)).

Thus, if the agency's interpretation of its regulations survives <u>Seminole Rock</u> review, we then analyze the regulations as interpreted under the framework established by <u>Chevron</u>. <u>See</u> <u>United States v. LaBonte</u>, 70 F.3d 1396, 1403-04 (1st Cir. 1995), <u>overruled on other grounds by</u> <u>United States v. LaBonte</u>, 117 S. Ct. 1673 (1997); <u>see also</u> <u>Martin v. Occupational Safety and Health Review Comm'n</u>, 499 U.S. 144, 151 (1991) ("Because applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policymaking prerogatives, we presume that the power authoritatively to interpret its own regulations is a component of the agency's <u>delegated lawmaking powers</u>." (emphasis added)).[4]

---

[4] This court's decision in <u>Headrick v. Rockwell Int'l Corp.</u>, 24 F.3d 1272 (10th Cir. 1994), is not to the contrary. That case stands only for the proposition that we owe no <u>Chevron</u> deference to a <u>statutory</u> interpretation not reached through proper rulemaking procedures. <u>See</u> 24 F.3d at 1282. Following the district court, <u>see</u> <u>Mission</u>, 909 F. Supp. at 844, Mission argues that the comment to the final regulations contained in the Federal Register is the <u>only</u> basis for the Secretary's imposition of the 85/15 rule. As a purely interpretive rule, argues Mission, that comment is nothing to which we owe deference under <u>Chevron</u>. <u>See</u> Appellee's Br. at 14-15 (citing <u>Headrick</u>, 24 F.3d at 1282). But Mission apparently does not challenge the Secretary's claim to have acted pursuant to his own regulations, <u>see</u> Appellee's Br. at 23 (recognizing that "the Secretary rested his claim to authority . . on his own regulations"), so this objection misses the point. If the Secretary's imposition of the 85/15 rule represents no more than a proper interpretation of his own <u>regulations</u>, then enforcing Mission's compliance with the rule does not depend on any act of statutory interpretation beyond that advanced by the operative regulations, and cannot therefore fall afoul of <u>Headrick</u>'s rule.

The above analysis notwithstanding, reviewing courts should not follow the Seminole Rock-Chevron two-step analysis when the disputed administrative action does not represent an actual interpretation of the agency's own regulations. If the Secretary's decision to impose the 85/15 rule against institutions of higher education converting to non-profit status is not an interpretation of the regulations at issue here, deferential review under the Seminole Rock-Chevron analysis will be inappropriate because, in such a case, the rule will have been adopted outside of the procedures Congress has authorized the Secretary to use when giving binding meaning to the statute. See I Davis & Pierce § 3.5, at 119-23.[5]

This distinction is easier to conceptualize than apply. Consider whether, by imposing the 85/15 rule against schools converting to non-profit status, the Secretary has merely interpreted the "any additional condition" language of 34 C.F.R. §§ 668.13(c)(4)(ii) and 668.14(a)(1). True, the rule is unquestionably an "additional condition." But mere linguistic consistency between the rule and the

---

[5] These procedures include, most obviously, legislative rulemaking by agencies granted policymaking authority by Congress. See I Davis & Pierce § 3.5, at 119. Adjudicative decisions may also serve this role, at least when made by bodies with rulemaking power. See id. at 120-21; see also Martin, 499 U.S. at 154 ("Within traditional agencies—that is, agencies possessing a unitary structure—adjudication operates as an appropriate mechanism not only for factfinding, but also for the exercise of delegated lawmaking powers, including lawmaking by interpretation."); Southern Ute Indian Tribe v. Amoco Prod. Co., 119 F.3d 816, 832 (10th Cir. 1997) (holding that Chevron deference only applies to rules promulgated in full conformity with APA procedures and "'adjudications that create binding precedents'" (quoting Amrep Corp. v. FTC, 768 F.2d 1171, 1178 (10th Cir. 1985))).

regulations cannot establish that the former is within the interpretive scope of the latter.  Because the plain language of both regulations is entirely unrestrictive, the Secretary could insert   any condition into a program participation agreement, and claim authorization for that action under the plain terms of §§ 668.13(c)(4)(ii) or 668.14(a)(1).  [6]  Chevron  deference to that condition would be inappropriate because, unless interested parties could reasonably anticipate the application of the regulation advanced by the agency such that they had a meaningful opportunity for notice and comment on the conditions to be selected, the imposition of an additional condition would not actually follow from an exercise of the agency's delegated policymaking authority.    [7]  Cf. Southern Ute Indian Tribe v. Amoco Prod. Co., 119 F.3d 816, 833 (10th Cir. 1997) (holding that Chevron deference does not apply to administrative actions "not promulgated with procedural protections attendant to" legislative rules and adjudications); Atchison, Topeka & Santa Fe Ry. Co. v. Pena   , 44 F.3d 437, 441-42 (7th Cir. 1994) (en

_____

[6] The regulations might therefore be open to challenge as unconstitutionally vague.  See, e.g., Brennan v. Occupational Safety & Health Review Comm'n, 505 F.2d 869, 872 (10th Cir. 1974).  Although Mission's complaint broadly raised due process concerns, we see little argument to that effect in its trial brief.  Because the district court's opinion does not suggest that it either considered the issue abandoned below or not raised at all, we leave it to the discretion of the district court whether to consider vagueness objections to the regulations at issue here.

[7] Although it is true that the regulations at issue here might otherwise be exempt from notice and comment requirements under the APA's statutory exemption of matters "relating to . . . benefits," see 5 U.S.C. § 553(a)(2), the Department of Education has waived any such exemption, see 36 Fed. Reg. 2532 (1971).

banc) (administrative rules are only entitled to _Chevron_ deference when agency follows APA's rulemaking procedures, including notice and comment provision, 5 U.S.C. § 553).

Stated another way, the dispositive question is whether imposition of the 85/15 rule is a _new_ rule, in which case the agency may not give it binding effect in the absence of compliance with APA notice and comment procedures, or an _interpretation_ of an existing rule, in which case it is binding precisely because it has, in effect, already been subject to the necessary procedural protections. _Compare Director, OWCP v. Greenwich Collieries_, 512 U.S. 267, 271 (1994) (refusing to uphold agency's position when claimed regulatory authorization too vague to encompass even broad outlines of that position) _with Thomas Jefferson Univ. v. Shalala_, 512 U.S. 504, 517 (1994) (upholding agency's interpretation of Medicare regulations on reimbursement of costs under _Seminole_ where regulatory "language . . . speaks not in vague generalities but in precise terms about the conditions under which reimbursement is, and is not, available"). That determination must be made by examining the procedural passage of the operative regulations to establish whether potentially affected parties were given an opportunity to comment on the "interpretation" now advanced. _Cf._ Robert A. Anthony, _The Supreme Court and the APA_, 10 Admin. L.J. Am. U. 1, 8 (Spring 1996) (arguing that for an administrative action to be interpretive of a regulation

there must be a "logical connection between the substantive content of the established regulation . . . and the substantive content of the document that purports to interpret it, such that the latter flows fairly from and is justified by the former").

Without such a safeguard, agencies could simply replace statutory ambiguity with regulatory ambiguity, thus creating Chevron deference for any administrative action that might be squeezed within the unrestricted terms of a promulgated regulation. Such a practice would make a mockery of Chevron, the APA, and judicial review because "the very purpose behind the delegation of lawmaking power to administrative agencies . . . is to 'resol[ve] . . . ambiguity in a statutory text.'" Thomas Jefferson Univ., 512 U.S. at 525 (Thomas, J., dissenting) (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 696 (1991)). "'An agency whose powers are not limited either by meaningful statutory standards or . . . legislative rules poses a serious potential threat to liberty and to democracy.'" Id. (quoting II Davis & Pierce § 11.5, at 204).

To resolve the case before us, we need not delineate formal criteria for defining a regulation's interpretive scope. Certainly, to be interpretive of the operative regulations, the condition selected by the Secretary need not be fully developed or examined in the notice of proposed rulemaking or in subsequent regulatory proceedings. Yet, regardless of the precise distinction employed, the

administrative action taken by the Secretary here cannot be regarded as within the legitimate interpretive scope of the regulations upon which he purports to have acted. The plain language of the regulations is entirely unrestricted, and the operative notice of proposed rulemaking and public statements of basis and purpose provide scant, if any, indication of how the Secretary proposes to utilize that apparently unlimited regulatory discretion. Mere consistency between the rule and the regulation does not establish that the former is derived from the latter by a process fairly described as interpretive. [8] We cannot therefore view the Secretary's actions as a proper interpretation of his own regulations because it is no interpretation at all.

### III

Although we conclude the Secretary is entitled to no deference under the Seminole Rock -Chevron standard, the agency's action might represent an

---

[8] This point has been made in a slightly different context by Judge Posner: "For a rule to be interpretive it is not enough, I believe, that the rule is consistent with the purpose of the statute that it is interpreting; for that is equally true of any valid legislative rule. A valid interpretive rule must in addition be derivable from the statute that it implements by a process fairly to be described as interpretive; that is, there must be a path that runs from the statute to the rule, rather than merely consistency between statute and rule." Richard A. Posner, The Rise and Fall of Administrative Law, 72 Chi.-Kent L. Rev. 953, 962 (1997).

interpretation of its governing statute adopted outside of administrative lawmaking channels. As a statutory "interpretive rule," it would then properly be reviewed under the less deferential standards enunciated in Skidmore v. Swift & Co., 323 U.S. 134 (1944), the stringency of judicial review varying with "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Id. at 140.[9] When Skidmore applies, Seminole Rock is necessarily inapplicable because the agency's action no longer represents an interpretation of its regulatory authority. Likewise, Chevron does not apply because, by the same token, no duly promulgated regulation actually informs the administrative action taken. And the APA's notice and comment procedures do not apply because interpretative rules are exempt from such requirements. See 5 U.S.C. § 553(b)(A).[10]

Although not focused on Skidmore review, the Secretary points us to 20 U.S.C. §§ 1099c(a) and 1094(c)(1)(B) as authority for the 85/15 rule.[11] We

_____

[9] The appropriate degree of Skidmore deference will also be affected by whether the record "actually addresse[s] in any detail the statutory authorization" for the agency's action. SEC v. Sloan, 436 U.S. 103, 117 (1978).

[10] Interpretive rules of "general applicability" are subject to a notice requirement by the APA. See 5 U.S.C. § 552(a)(1)(D).

[11] Mission argues that the only source of statutory authority on which the Secretary may rely is 20 U.S.C. § 1099c(h), which governs provisional certification of institutional

(continued...)

- 19 -

eligibility, both because that is the provision relied on by the Secretary in advancing the rule's application to non-profits such as Mission, see Appellee's Br. at 18, and because the government failed to cite §§ 1099c(a) and 1094(c)(1)(B) to the district court, see id. at 22-23; see also Tele-Communications, Inc. v. Commissioner, 12 F.3d 1005, 1007 (10th Cir. 1993) ("[G]eneral rule is that an appellate court will not consider an issue raised for the first time on appeal."). Neither claim has merit. As we have noted, the Secretary has consistently defended his application of the rule as being pursuant to his regulatory authority under 34 C.F.R. §§ 668.13(c)(4)(ii) and 668.14(a)(1). See supra note 2 and accompanying text. In addition, the district court addressed itself to both regulatory provisions without objection from Mission. See Mission, 909 F. Supp. at 839-40. Consequently, the relevant question is which sources of statutory authority were claimed by the Secretary for the promulgation of these two controverted regulations. The record reveals that 34 C.F.R. § 668.13(c)(4)(ii) was promulgated pursuant to 20 U.S.C. § 1099c, and 34 C.F.R. § 668.14(a)(1) pursuant to 20 U.S.C. §§ 1085, 1088, 1091, 1092, 1094, 1099a-3, 1099c, and 1141.

Moreover, the government's trial brief, though not a model of legal clarity, argues that the 1992 amendments to the HEA provide the Secretary with broad legal authority to oversee and regulate the terms and conditions under which schools may be approved to participate in Title IV programs. See Appellee's Supp. App. at 226 ("The 1992 HEA Amendments . . . contained many program integrity provisions that required new regulations to interpret and implement them."). The government stressed to the trial court that the HEA was amended in order to "increase[] the monitoring by the Secretary and accountability of institutions participating in the student financial aid programs. The[] regulations implement many statutory requirements pertaining to the financial responsibility and administrative standards for schools that participate or seek to participate in the Title IV, HEA programs . . . ." Appellee's Supp. App. at 230-31 (emphasis added). Finally, the Secretary cited to the regulations addressing certification and provisional participation agreements, see id. at 231 (citing 34 C.F.R. §§ 668.13 & 668.14; 59 Fed. Reg. 9534-39), and specifically referenced 34 C.F.R. § 668.13(c)(4)(ii), see id. at 232.

As a result, the government's arguments in reliance on 20 U.S.C. §§ 1099c(a) and 1094(c)(1)(B) are best viewed as a more detailed exposition of an issue already placed before the district court. They do no more than explain with particularity the general claim raised below that the Secretary's actions are permissible because they proceed from a statutory "mandate . . . to improve the accountability and integrity of schools participating in the HEA programs through increased oversight and control." Appellee's Supp. App. at 226. As such, they are not "new." Cf. Majors v. Housing Authority, 652

(continued...)

cannot agree with the government's assertion that the 85/15 rule is merely an interpretation of 20 U.S.C. § 1094(c)(1)(B). Properly read, § 1094(c)(1)(B) only authorizes the Secretary to adopt regulations setting financial responsibility and administrative capability  standards . In such a case, we must agree with the Seventh Circuit that

> [w]hen Congress authorizes an agency to create standards, it is delegating legislative authority, rather than itself setting forth a standard which the agency might then particularize through interpretation. Put differently, when a statute does not impose a duty on the persons subject to it but instead authorizes (or requires—it makes no difference) an agency to impose a duty, the formulation of that duty becomes a legislative task entrusted to the agency. Provided that a rule promulgated pursuant to such a delegation is intended to bind, and not merely to be a tentative statement of the

---

[11](...continued)
F.2d 454, 457 n.2 (5th Cir. 1981) (regulation cited by plaintiff on appeal is not "new issue" when it directly supports argument raised below that statute imposed specific obligation on defendant); see also Ford v. Bernard Fineson Dev. Ctr., 81 F.3d 304, 307 (2d Cir. 1996) (allowing appellate submission of "a new legal argument that concerns an issue already considered at some length by the district court").

We also see little merit to appellee's claim that, because the Secretary's grant of provisional certification also certified Mission's administrative capability and financial responsibility, imposition of the 85/15 rule cannot proceed from the statutory requirements of 20 U.S.C. §§ 1099c(a) or 1094(c)(1)(B). See Appellee's Br., tab B, Plaintiff's Ex. 9, at 1. The Secretary stated only that the Wright Business School "meets the minimum requirements . . . of administrative capability, and financial responsibility." Id. (emphasis added). Furthermore, the same communication to Mission explicitly conditioned provisional certification on acceptance of a provisional participation agreement that mandated compliance with the 85/15 rule. See id. at 2 (incorporating conditions in provisional participation agreement by reference); Appellant's App. at 84 (conditioning certification in provisional participation agreement on compliance with 85/15 rule). We therefore agree with the Secretary that this communication need not be read to mean that Mission would have met its administrative capability and financial responsibility requirements even without compliance with the 85/15 rule.

- 21 -

agency's view, which would make it just a policy statement, and not a rule at all, the rule would be the clearest possible example of a legislative rule, as to which the notice and comment procedure not followed here is mandatory, as distinct from an interpretive rule; for there would be nothing to interpret.

Hoctor v. United States Dep't of Agric., 82 F.3d 165, 169-70 (7th Cir. 1996) (citing American Mining Congress v. Mine Safety & Health Admin., 995 F.2d 1106, 1109 (D.C. Cir. 1993); Robert A. Anthony, "Interpretive" Rules, "Legislative" Rules and "Spurious" Rules: Lifting the Smog, 8 Admin. L.J. Am. U. 1 (1994)). Thus, the imposition of the 85/15 rule cannot be justified as an interpretation of § 1094(c)(1)(B). See id. at 170-71 ("When agencies base rules on arbitrary choices they are legislating, and so these rules are legislative or substantive and require notice and comment rulemaking, a procedure that is analogous to the procedure employed by legislatures in making statutes."). And, in issuing the 85/15 rule, the Secretary made no attempt to comply with the APA's required procedures for legislative rulemaking.

Whether the 85/15 rule may be upheld as a statutory "interpretive rule" under 20 U.S.C. § 1099c(a) is unclear on this record. Under § 1099c(a), the Secretary is charged with "determin[ing] the administrative capability and financial responsibility of an institution of higher education in accordance with the requirements of this section." Unlike the specific directive to develop "standards" in § 1094(c), the Secretary is charged with "determin[ing] whether an

institution has the financial responsibility" to participate in Title IV financial aid programs, see 20 U.S.C. §§ 1070 to 1099c-1, and federal work study programs, see 42 U.S.C. §§ 2751-2756b. Because the Secretary is charged merely with determining the financial responsibility of covered institutions, the government may have a legitimate argument that the 85/15 rule is a valid interpretation of § 1099c(c), even when evaluated under the less deferential Skidmore standard. The record before us, however, appears insufficient to evaluate properly whether the 85/15 rule survives Skidmore review as a valid statutory "interpretative rule." [12] We therefore remand to the district court for further proceedings.

**REVERSED** and **REMANDED** for further proceedings consonant with the views herein expressed.

---

[12] For instance, we note that the appellee submitted to the trial court two depositions from the Acting Director of the Department's Institutional Participation Division. See Appellee's Supp. App. at 151 n.3. The briefs to the trial court suggest that some of this material may well bear on the "thoroughness" of the agency's "consideration" in issuing the 85/15 rule, which matter is directly relevant to review under Skidmore. See, e.g., id. at 153, 158-61; Skidmore, 323 U.S. at 140.