**ST. LUKE'S METHODIST HOSPITAL, Plaintiff,**

v.

Tommy G. THOMPSON,[1] Secretary of the United States Department of Health and Human Services, Defendant.

No. C 00–13 MJM.

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

Sept. 26, 2001.

---

1. Pursuant to Federal Rule of Civil Procedure 25(d)(1), the Court substitutes Tommy G. Thompson as defendant in place of Donna E. Shalala.

768

Nancy J. Penner, Shuttleworth & Ingersoll, Cedar Rapids, IA, Frank P. Fedor, Anthony M. Perez, Murphy, Austin, Adams, Schoenfeld, LLP, Sacramento, CA, for Plaintiff.

Lawrence D. Kudej, Assistant United States Attorney, Cedar Rapids, IA, Michael R. Fry, Assistant Regional Counsel, Dept. of Health & Human Services, Office of General Counsel, Kansas City, MO, for Defendant.

## OPINION and ORDER

MELLOY, District Judge.

Pursuant to 42 U.S.C. § 1395oo(f)(1), St. Luke's Methodist Hospital ("St. Luke's"), located in Cedar Rapids, Iowa, seeks judicial review of the final decision of the Secretary of Health and Human Services ("the Secretary") denying St. Luke's an exception to the cost limits applicable for Medicare skilled nursing facilities for the year 1992. Exception requests are governed by 42 C.F.R. § 413.30 which provides, in certain circumstances, for discretionary reimbursement of provider costs which exceed applicable cost limits. In prior years St. Luke's had established that it provided needed "atypical services" to Medicare patients, see 42 C.F.R. § 413.30(f)(1), and thus was granted reimbursement above the applicable limits for the reasonable "actual" costs of services provided. With regard to its exception request for 1992, St. Luke's relied upon the same criteria as in prior years to prove exception eligibility. This time, however, the request was denied on the basis of the Secretary's new interpretation of the regulation as articulated in his Provider Reimbursement Manual ("PRM") § 2534.5.

In this motion, St. Luke's asks the Court to hold that the Secretary's reinterpretation of 42 C.F.R. § 413.30, as embodied in PRM § 2534.5, is arbitrary, capricious, an abuse of discretion, or not in accordance with law. The relevant facts are undisputed and the parties agreed at oral argument to treat the matter as a cross-motion for summary judgment. For the reasons discussed herein, the court finds PRM § 2534.5 invalid as an unreasonable interpretation of 42 C.F.R. § 413.30 in light of the language of that regulation and the principles underlying the Medicare statute. Accordingly, St. Luke's motion shall be granted and the Secretary's denied.

### I. Summary Judgment Standard

■ "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.Pro. 56); *see also Krentz v. Robertson Fire Prot. Dist.,* 228 F.3d 897, 902 (8th Cir.2000). A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party and give the nonmoving party the benefit of all reasonable inferences that can be drawn from those facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Rabushka, ex rel. U.S. v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997), *cert. denied,* 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998). Where the litigants concurrently pursue summary judgment, each motion must be evaluated independently to determine whether there exists a genuine dispute of material fact and whether the movant is entitled to judgment as a matter of law. *See Wermager v. Cormorant Township Bd.,* 716 F.2d 1211 (8th Cir. 1983).

## II. *Summary of Facts and Relevant Legislation*

■ With this action, St. Luke's is seeking reimbursement under 42 C.F.R. § 413.30 for costs incurred above the statutorily-delineated cost limit in providing atypical services to special needs Medicare patients through its hospital-based skilled nursing facility (HB–SNF). Resolution of St. Luke's case turns on one legal issue— the validity of PRM § 2534.5,[2] a newly-

issued rule purporting to "interpret" and provide implementing details for 42 C.F.R. § 413.30. Prior to issuance of PRM § 2534.5, the applicable limit against which exception requests were measured was the routine cost limit (RCL) established by Congress and codified at 42 U.S.C. § 1395yy. After PRM § 2534.5, however, an HB–SNF such as St Luke's could be reimbursed for atypical costs only if its total costs exceed 112% of the peer group mean for HB–SNFs—a figure significantly higher than the RCL. Thus, in comparison to the Secretary's prior practice, PRM § 2534.5 effectively raised the threshold cost level which HB–SNFs had to exceed to establish exception eligibility. St. Luke's costs for 1992, although above the statutory RCL, did not exceed the new higher threshold figure—112% of the peer group mean—and St. Luke's was, accordingly, not entitled to consideration for discretionary reimbursement under 42 C.F.R. § 413.30.

The validity of PRM § 2534.5 must be determined against the backdrop of the Medicare Act and its implementing regulations. Therefore, for the sake of clarity, the Court will include a rather detailed summary of the substance and chronology of the Act's relevant provisions as drawn from the record and the parties' briefs.

### A. *Medicare program reimbursement*

1. Reimbursement for the "reasonable cost" of covered services:

The Medicare program reimburses skilled nursing facilities, both hospital-

---

**2.** The PRM, or Provider Reimbursement Manual, is published by the Health Care Financing Administration (HCFA), under the authority of the Secretary, "to assist interested parties in navigating the shoals of the Medicare compensation and reimbursement system." *Shalala v. St. Paul–Ramsey Med. Ctr.,* 50 F.3d 522, 524 (8th cir.1995). PRM

provisions have not been subject to the formal rulemaking procedures of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.,* and are generally considered merely interpretive rules which advise the public of the agency's opinion without the effect or force of law. *See id.* at 528 n. 4 (citations omitted).

based (HB–SNF) and freestanding (FS–SNF), for the "reasonable cost" of covered services provided to Medicare program beneficiaries. 42 U.S.C. § 1395x(v)(1)(A). "Reasonable cost" is defined as only those costs "actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." *Id.* Per the statute, the reasonable cost shall be determined:

in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services.... Such regulations ... may provide for ... the use of estimates of costs of particular items or services, may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by the insurance programs established under this subchapter, and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs.

*Id.*

The statute further prohibits Medicare and other payors from "cross-subsidizing" each other, stating that

[s]uch regulations shall ... take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance programs established under this subchapter) in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs....

*Id.* This "no cross-subsidization" principle is reiterated in 42 C.F.R. § 413.5(a) and (b)(3), and 42 C.F.R. § 413.50.

2. Routine cost limits established by regulation:

Routine service costs are subject to Routine Cost Limits ("RCLs"). Before 1984, the RCL for FS–SNFs was set at 112 percent of the peer group mean for FS–SNFs and the RCL for HB–SNFs was set at 112 percent of the peer group mean for HB–SNFs.[3] The RCL for HB–SNFs was higher than that for FS–SNFS.[4] In 1985, the Health Care Financing Administration ("HCFA"), in a report to Congress, stated that, after reviewing several external studies on the issue, it was the HCFA's position that approximately 50 percent of the reported cost differences between HB–SNFs and FS–SNFs were attributable to variations in intensity of care or casemix. The remaining cost differences were deemed unassociated with a wide range of control variables. The parties dispute, and

3. The "112 percent" figure represents one standard deviation from the mean.

4. Articulated reasons for the separate cost limits for FS–SNFs and HB–SNFs lack conformity and the legislative history does not provide a clear or consistent answer. Advocates of separate cost limits argue that HB–SNFs incur higher costs because they render more intensive care, thereby justifying higher cost limits. Those opposed to separate limits, argue that all SNFs must meet the same standards, and therefore, separate cost limits are inappropriate.

the record is inconclusive, as to whether the underlying data support the Secretary's current position that inefficiency was therefore the likely cause of the other 50 percent variance.[5]

3. Exceptions to cost limits permitted by regulation:

Congress authorized the Secretary to grant exceptions to the RCLs under 42 C.F.R. § 413.30(f)(1).[6] This regulation provides for the granting of exceptions from the RCL for SNFs which provide atypical services as therein defined. It reads, in part, as follows:

> (f) Exceptions. Limits established under this section may be adjusted upward for a SNF ... under the circumstances specified in paragraphs (f)(1) through (f)(5) of this section. An adjustment is made only to the extent that the costs are reasonable, attributable to the circumstances specified, separately identified by the SNF ... and verified by the intermediary.
>
> (1) Atypical services. The SNF ... can show that the—
>
> > (i) Actual cost of services furnished by a SNF ... exceeds the applicable limit because the services are atypical in nature and scope, compared to the services generally furnished by SNFs ... similarly classified; and
> >
> > (ii) Atypical services are furnished because of the special needs of the patients treated and are necessary in the

efficient delivery of needed health care.

The substance of 42 C.F.R. § 413.30(f)(1) was first issued as a regulation effective July 1, 1974.[7] The precise language of the current regulation was issued as an amended regulation effective July 1, 1979.[8] In 1986, as "part of [the] overall plan for reorganization of the regulations in 42 CFR Part 405 in order to make them easier to locate and use,"[9] the regulation was redesignated 42 C.F.R. § 413.30(f)(1), the designation by which it was identified at the time relevant to this dispute.[10]

4. Congress lowers the RCL for HB–SNFs:

In 1984, as part of the Deficit Reduction Act ("DEFRA") of 1984, Congress lowered the RCL for HB–SNFs relative to the RCL for FS–SNFs. This change was codified at 42 U.S.C. § 1395yy(a). The RCL for FS–SNFs remained at "112 percent of the mean per diem routine service costs for freestanding skilled nursing facilities ..." The RCL for HB–SNFs, however, was lowered to "the sum of the limit for freestanding skilled nursing facilities ..., plus 50 percent of the amount by which 112 percent of the mean per diem routine service costs for hospital-based skilled nursing facilities ... exceeds the limit for freestanding skilled nursing facilities. ..." The Secretary's authority to make adjustments to these newly-established RCLSs "to the extent the Secretary deems appropriate" was reaffirmed in § 1395yy(c).

---

5. This dispute will be discussed in the Court's analysis.

6. The regulation was renumbered 413.30(e)(1) effective September 7, 1999. 64 Federal Register 42610 (August 5, 1999).

7. It was originally numbered 20 C.F.R. § 405.460(f)(2). 39 Federal Register 20164 (June 6, 1974).

8. The regulation was then numbered 42 C.F.R. § 405.460(f)(1). 44 Federal Register 31802, at 31804 (June 1, 1979).

9. 51 Federal Register 34790 (September 30, 1986).

10. The regulation was renumbered 413.30(e)(1) effective September 7, 1999. 64 Federal Register 42610 (August 5, 1999).

5. Effect of 42 U.S.C. § 1395yy(c) on 42 C.F.R. 413.30 exceptions:

Although 42 U.S.C. § 1395yy(a) lowered the RCL of HB–SNFs, it did not, at least initially, prohibit HB–SNFs which qualified for an atypical services exception under 42 C.F.R. § 413.30(f)(1) from obtaining full reimbursement of reasonable costs. After passage of § 1395yy, the Secretary, in exercising the discretion granted in § 1395yy(c), continued to measure exceptions to HB–SNFs from the RCL, rather than from some point above the RCL.

In July, 1994, nearly ten years after the codification of 42 U.S.C. § 1395yy, the Secretary, through the Health Care Financing Administration ("HCFA"), issued Transmittal No. 378 which published new provisions of the PRM relating to SNF exception requests. Among these was PRM § 2534.5 which required that the exception amount of an HB–SNF be measured not from its RCL, as had been the Secretary's interpretation through July, 1994, but rather that it now be measured from 112 percent of its peer group mean, a point significantly higher than the RCL for an HB–SNF. By adding this new requirement in the manual provision, the Secretary created what is referred to by St. Luke's as the "gap" methodology and by the Secretary as a "discount factor." It is that gap or discount factor which is at issue in this case.

6. Illustration of PRM § 2534.5:

Because the operation of the PRM is somewhat complex, the following explanation, provided by the Sixth Circuit when addressing a similar challenge, is helpful:

[T]here are three possible categories of actual costs: the provider's actual costs can be (1) less than or equal to the statutory RCL; (2) greater than or equal to the statutory RCL but less than 112% of its peer group mean; or (3) greater than or equal to 112% of its peer group mean. Pursuant to PRM § 2534.5, if the provider's actual costs are less than or equal to the statutory RCL, the provider is reimbursed the full amount of its actual costs (category 1); if the provider's costs are greater than or equal to the statutory RCL, *but less than 112% of the HB–SNF mean*, the provider is *only* reimbursed in the amount of the statutory RCL (category 2); if the provider's costs are greater than or equal to 112% of the HB–SNF mean, the provider is reimbursed in the amount of the statutory RCL, *plus* any additional amount attributable to atypical services up to the total amount by which the actual costs exceed the 112% of the mean (category 3). Accordingly, category (2) represents a "gap" for which a provider will not be reimbursed above the RCL amount despite having costs above the RCL. That provider does not have the opportunity to show that its costs were reasonable and for atypical services.

*St. Francis Health Care Centre v. Shalala,* 205 F.3d 937, 943 (6th Cir.2000).

The following formula illustrates this explanation:

*Assume:* FS–SNF statutory RCL = 112% of the FS–SNF mean = $80
*Assume:* 112% of HB–SNF mean = $120
*Then:* HB–SNF statutory RCL = 112% of the FS–SNF mean + 50% (112% of the HB–SNF mean − 112% of the FS–SNF mean)
= $80 + .50($120 − $80)
= $80 + $20
= $100

Prior to PRM § 2534.5, an HB–SNF was potentially eligible for exception reimbursement of actual costs above $100 (the statutory HB–SNF RCL); following PRM § 2534.5 that same HB–SNF is only eligible for reimbursement of costs exceeding $120.

To further illustrate, an HB–SNF with the per diem actual costs listed below and the RCLs listed above would be entitled to the corresponding maximum reimbursement rates:

| | Actual Costs | | Maximum Reimbursement |
|---|---|---|---|
| | $150 | | $130 |
| | $140 | category 3 | $120 |
| | $130 | | $110 |
| 112% of HB–SNF mean ($120) | $120 ] | | [ $100 |
| | $110 ] | (the "gap") | [ $100 |
| HB–SNF statutory RCL | $100 ] | category 2 | [ $100 |
| | $ 90 | category 1 | $ 90 |
| 112% of FS–SNF mean ($80) (i.e., FS–SNF statutory RCL) | $ 80 | | $ 80 |

*See St. Francis,* 205 F.3d at 942–43.

**B. *St. Luke's exception request***

St. Luke's operates a 28–bed Medicare certified HB–SNF in Cedar Rapids, Iowa. For fiscal year (FYE) 1992, St. Luke's exceeded all of the benchmarks established by the Secretary to determine whether it provided atypical services. A lower than average length of stay, combined with higher than average Medicare utilization and Medicare SNF ancillary costs all point to the provision of atypical services to higher acuity patients under the HCFA implementing instructions. St. Luke's had an average length of stay of 20 days compared to a national average of 132.32, Medicare utilization of 69.2% compared to a national average of 52.39%, and Medicare SNF ancillary per diem costs of $86.83 compared to a national average of $62.73.

Pursuant to 42 C.F.R. § 413.30(f)(1), St. Luke's requested an atypical services exception from HCFA for the cost reporting periods ending August 31, 1990, 1991, 1992 and 1993. For the cost reporting periods 1990, 1991 and 1993, St. Luke's established that it had provided atypical services using the three criteria stated above, and was granted an exception by HCFA to cover all of its actual costs. The amounts of the exceptions were $21.81 per day for 1990, $22.75 per day for 1991, and $28.19 per day for 1993.

St. Luke's submitted its exception request for FYE 1992 on March 21, 1995. Because St. Luke's had submitted this request to its intermediary after July 20, 1994, it was now governed by PRM § 2534.5. For FYE 1992, St. Luke's was denied an exception from HCFA even though its costs exceeded its RCL by $34.75 per day and it had once again established that it had provided atypical services using HCFA's three benchmarks.[11]

11. On December 20, 1996, St. Luke's was notified that it had been awarded an excep- tion in the amount of $5.54 per day for FYE 1992. The intermediary had reopened St.

HCFA's letter denying the exception request explained that the only reason St. Luke's did not qualify for an exception was because of the "gap" or "discount" created by PRM § 2534.5.

The parties have stipulated that all facts contained in the March 21, 1995, exception request for FYE August 31, 1992 are true, and there is no dispute that St. Luke's otherwise qualified for an atypical services exception for FYE 1992. Thus, the sole issue on summary judgment is whether HCFA's methodology of determining the amount of an atypical service exception under HCFA Transmittal Number 378, as found in PRM § 2534.5, is arbitrary and capricious or not in accordance with law.

### III. Discussion

This case turns on the Secretary's interpretation of the exception-eligibility process under the Medicare Act as governed by 42 C.F.R. § 413.30. Under the methodology in effect until 1994, it was possible for an HB–SNF, such as St. Luke's in this case, which qualified for an atypical services exception under 42 C.F.R. § 413.30(f)(1) to receive reimbursement for all actual costs over the routine cost limit (RCL). In 1994, the Secretary, with issuance of PRM § 2534.5, put in place new implementing instructions which applied to St. Luke's exception request for FYE 1992.[12] Under the Secretary's PRM § 2534.5, the amount of the exception is no longer measured from the routine cost limit of the HB–SNF; it is instead measured from a higher point—112 percent of the peer group mean. When the exception is measured from this higher point, there is a gap between the RCL and the 112 percent group mean for which no HB–SNF can ever obtain relief. St. Luke's argues that this methodology is arbitrary, capricious and not in accordance with law.

More specifically, St. Luke's argues that PRM § 2534.5 is inconsistent with the governing regulation, 42 C.F.R. § 413.30(f)(1), which states that the routine cost limits established under this section may be adjusted upward if a provider proves that the "actual cost" of atypical services exceeds the applicable limit. St. Luke's contends that this regulation plainly requires that measurement of an exception start at the RCL—the "applicable limit," according to St. Luke's—and not at some point higher than that limit, as under the Secretary's new PRM provision. St. Luke's argues that the Secretary's measure disregards portions of the regulation by looking only to whether the provider's cost exceeds 112 percent of the peer group mean rather than whether the provider's cost exceeds the RCL, the relevant applicable limit. St. Luke's argues that PRM § 2534.5 further misconstrues the regulation's language by confusing the provision of atypical services with the cost of atypical services. According to St. Luke's, the regulation directs the Secretary to look only to whether there were atypical services, and not to an analysis of whether the costs for those atypical services were atypical. St. Luke's contends that the effect of PRM § 2534.5 is to incorrectly define exception eligible costs

Luke's cost report for 1992 to lower the RCL, and thereby also effect a lowering of St. Luke's 112 percent of its peer group mean. Because a portion of St. Luke's costs over its RCL now also exceeded 112 percent of its peer group mean by $5.54 per day, St. Luke's was awarded an exception in that amount. The amount in dispute is the $26.62 per day reimbursement "gap" remaining after St. Luke's cost report was reopened and the

$5.54 per day exception was awarded. The total amount in dispute is $163,420. St. Luke's is asking this Court to award it a total exception in the amount of $36.16 per day [365 days($5.54 + $26.62)], or $195,054,

12. PRM § 2534.5 applies to St. Luke's 1992 exception request because the request was submitted after the PRM provision's 1994 issue date.

based on the latter criterion rather than the former.

Second, St. Luke's argues that the HCFA's action under PRM § 2534.5 is invalid because it was not promulgated under the notice and comment provisions of the Administrative Procedures Act ("APA"). St. Luke's contends that PRM § 2534.5 represents a dramatic substantive change in policy and that, under the law, such a change requires implementation pursuant to the formal rulemaking procedures of the APA. And finally, St. Luke's argues that because the HCFA has failed to give an adequate explanation for changing its exceptions policy, such a dramatic change is arbitrary and capricious even if properly articulated in an interpretive rule. While St. Luke's does not dispute that the HCFA can change its policy in accordance with implementing the Medicare Program, St. Luke's contends that when it does so HCFA has a legal obligation to provide a rational explanation for the change. St. Luke's argues that HCFA's proffered explanation for the switch under PRM § 2534.5 is wrong on the facts and, moreover, results in an illogical procedure.

In response, the Secretary argues that the governing regulation and statute are broad in scope, use general language, and do not address the criteria or procedures to be used for determining whether services are, in fact, atypical when compared to other similarly classified providers, or how to determine whether the cost of those services is reasonable and necessary in the efficient delivery of health care. The Secretary argues that under the applicable regulation, St. Luke's is only entitled to reimbursement of actual costs that are reasonable and necessary to patient care, and that Congress, in enacting DEFRA, eliminated from that calculation the costs of HB–SNFs that are deemed to be unreasonable. The Secretary contends that the instructions in PRM § 2534.5 are a reason-

able interpretation of the regulatory and statutory scheme and furthers that scheme by recognizing only reasonable costs under the exceptions process.

The statute providing for judicial review of Medicare provider reimbursement decisions, 42 U.S.C. § 1395oo(f)(1), incorporates the review standards of the APA, 5 U.S.C. § 701 *et seq. See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Hennepin County Med. Ctr. v. Shalala*, 81 F.3d 743, 748 (8th Cir.1996). The APA standard of review, 5 U.S.C. § 706(2)(A) and (E), provides that agency action, findings, and conclusions can be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or are "unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute." *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381; *St. Francis Health Care Ctr.*, 205 F.3d at 943.

■ When, like in this case, the issue is whether the agency has erred in interpreting its own regulations, the plain meaning of a statute or regulation controls, if there is one, regardless of an agency's interpretation. *Hennepin County Med. Ctr.*, 81 F.3d at 748 (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Where "Congress has directly spoken to the precise question at issue," the court must respect Congressional intent. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778; *see also Shalala v. St. Paul–Ramsey Med. Ctr.*, 50 F.3d 522, 528 (8th Cir.1995) (finding Secretary's interpretation of "binding" rule invalid where "plainly erroneous or inconsistent" with the text of the rule). However, if Congress has not spoken directly to the issue, the reviewing court must determine whether the agency has construed the regulation in a reasonable,

non-arbitrary manner, taking into consideration that deference due the agency interpretation under the circumstances. *See Christensen v. Harris County,* 529 U.S. 576, 586–88, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (holding that *Chevron* deference to agency interpretation may be tempered where the interpretation is not contained in the statute or regulation itself but rather is articulated through less formal means such as "policy statements, agency manuals, and enforcement guidelines"); *Bethlehem Steel Corp. v. United States,* 146 F.Supp.2d 927, 936 (CIT 2001) (articulating standard as "[i]f the statute is silent or ambiguous, the degree of respect accorded an agency's interpretation depends on whether that interpretation is the product of a process that gives it 'the force of law'—for example, a formal adjudication or notice-and-comment rulemaking") (citation omitted).

Applying these principles, the Court will first address St. Luke's contention that PRM § 2534.5 is inconsistent with the plain language of the governing regulation, 42 C.F.R. § 413.30. The Court will then determine the level of deference due to the Secretary's interpretation of the regulation in this case. And finally, taking into consideration the appropriate deference, the Court will determine whether PRM § 2534.5 represents a reasonable interpretation of 42 C.F.R. § 413.30 in light of that regulation's language and the principles underlying the Medicare Act.

1. *Is PRM § 2534.5 inconsistent with the plain meaning of 42 C.F.R. § 413.30?*

Section 413.30 sets forth the "general rules under which HCFA may establish limits on SNF ... costs recognized as reasonable in determining Medicare program payments." 42 C.F.R. § 413.30(a). It also sets forth rules governing exceptions to established limits "that HCFA may make as appropriate in considering special needs or situations of particular providers." *Id.* With regard to the exceptions process, § 413.30(f) provides that otherwise—established cost limits may be adjusted upward for an SNF under certain circumstances, but "only to the extent that the costs are reasonable, attributable to the circumstances specified, separately identified by the SNF ... and verified by the intermediary." At issue in this case is the exception for atypical service providers. Subsection 413.30(f)(1) requires: (i) that the SNF show that the actual cost of services furnished by an SNF exceeds the applicable limit because the services are atypical in nature and scope, compared to the services generally furnished by SNFs similarly classified; and (ii) that the atypical services are furnished because of the special needs of the patients treated and are necessary in the efficient delivery of health care. The "applicable limit" referenced in the provision is the subsequently-enacted statutory RCL, which as of 1984 is codified at 42 U.S.C. § 1395yy(a).[13]

It is undisputed that St. Luke's met the benchmarks established by the Secretary to demonstrate exceptions eligibility under subsection (f)(1). Specifically, St. Luke's demonstrated that compared to a national average it had a lower length of stay, a higher Medicare utilization rate, and higher Medicare ancillary per diem costs.[14] *See* HCFA Transmittal No. 378. Thus,

---

13. Again, this statute established the two-tier RCL structure by which the RCL is set lower for HB–SNFs relative to FS–SNFs. *See* Facts, *supra,* for further explanation and illustration.

14. St. Luke's had an average length of stay of 20 days compared to a national average of 132.32, Medicare utilization of 69.2% compared to a national average of 52.39%, and Medicare SNF ancillary per diem costs of $86.83 compared to a national average of $62.73.

under the regulation, St. Luke's qualified for a discretionary exception to the extent that actual costs above the RCL were "reasonable, attributable to the circumstances specified, separately identified, and verified." *See* 42 C.F.R. § 413.30(f).

Applying that regulatory language to the case at bar, the Secretary, by promulgating PRM § 2534.5, seeks to deny any and all consideration of costs within the gap—above the RCL but below 112% of the HB–SNF mean—on the grounds that such costs are not "reasonable" in light of 42 U.S.C. § 1395yy(a) which, according to the Secretary, reflects Congressional intent that no HB–SNFs be reimbursed for costs incurred within the gap regardless of the services provided. Thus, under PRM § 2534.5, an HB–SNF may be reimbursed under the exceptions process only to the extent that its otherwise eligible costs exceed 112% of the HB–SNF mean. Anything below that is deemed unreasonable.

There is no explicit language in either 42 C.F.R. § 413.30 or 42 U.S.C. § 1395yy which mandates the Secretary's interpretation. The regulation refers only to discretionary adjustments to the "applicable limit" and the statute is silent as to its effect on the pre-existing exceptions process. However, in light of the potential breadth of the discretionary language in the regulation, the Court declines to conclude that PRM § 2534.5 is necessarily inconsistent with the regulatory language and will instead focus on whether, taking into consideration the appropriate level of deference due, the Secretary has construed the regulation in a reasonable, non-arbitrary manner.

2. *What level of deference is due the Secretary's interpretation?*

It is a well-established "general rule" that an agency interpreting its own regulations is entitled to substantial deference and the Secretary argues the applica-

bility of that rule to this case. *See* Def.'s Brief, at pp. 16–18 (citing, e.g., *Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 94–95, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995); *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381; *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778; *St. Francis Health Ctr.*, 205 F.3d at 943; *St. Paul–Ramsey Med. Ctr.*, 50 F.3d at 527–28; and *Creighton Omaha Reg. Health Care Corp. v. Bowen*, 822 F.2d 785, 789 (8th Cir.1987)). As confirmed by the Supreme Court's recent opinion in *Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), however, this so-called "Chevron-style deference" does not apply if the agency interpretation is embodied in an informal or "interpretive" rule. *See id.* at 587, 120 S.Ct. 1655 (citing supporting Supreme Court case law for proposition that "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, *agency manuals*, and enforcement guidelines, all of which lack the force of law—do not warrant Chevron-style deference," (emphasis added), including *Reno v. Koray*, 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995); *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 256–58, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991); and *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 157, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991)). *Cf. United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 2172–73, 150 L.Ed.2d 292 (2001) (noting that the "overwhelming number of [Supreme Court] cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication") (citations omitted). This distinction in treatment is premised on the fact that interpretive rules have not been subjected to "notice-and-comment" procedures under the APA and thus have not been informed by that formalized, inclusive process. *See id.*, 121 S.Ct. at 2172 (discussing distinc-

tion and noting the APA's "relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement [with the effect of law]"). Instead, interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Guernsey Mem. Hosp.* 514 U.S. at 99, 115 S.Ct. 1232 (quoting *Chrysler Corp. v. Brown,* 441 U.S. 281, 302 n. 13, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), in turn quoting the Attorney General's Manual on the Administrative Procedure Act 30 n. 3 (1947)). Such "interpretive rules" do not have the force and effect of law and "are not accorded that weight in the adjudicatory process." *Id.; accord In Home Health, Inc. v. Shalala,* 188 F.3d 1043, 1046 (8th Cir.1999).

■■■ *Christensen* instructs that these informal interpretations are " 'entitled to respect' under [the Supreme Court's] decision in *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), but only to the extent that those interpretations have the 'power to persuade.' " *Christensen,* 529 U.S. at 587, 120 S.Ct. 1655 (quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161). Under *Skidmore,* interpretations of the Administrator, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort to guidance," 323 U.S. at 140, 65 S.Ct. 161, particularly where "based upon more specialized experience and broader investigations and information." *Id.* at 139, 65 S.Ct. 161. "The weight of such a

judgment will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give power to persuade, if lacking power to control." *Id.* The Eighth Circuit has similarly held that "[d]eference is due when an agency has developed its interpretation contemporaneously with the regulation, when the agency has consistently applied the regulation over time, and when the agency's interpretation is the result of thorough and reasoned consideration." *Sioux Valley Hosp. v. Bowen,* 792 F.2d 715, 719 (8th Cir.1986) (citing, *inter alia, Skidmore* and finding little deference due where policy had been interpreted inconsistently and was embodied in PRM which had not gone through the notice and comment rulemaking process).

*Christensen* applies to the case at bar. The Secretary's interpretation of 42 C.F.R. § 413.30, as articulated in PRM § 2534.5,[15] is not contained in the regulation itself. *See* discussion, *supra* (concluding that nothing in the regulation or statutory scheme requires the interpretation proposed by the Secretary). Rather, the regulation appears to contemplate reimbursement of the "actual cost of services furnished" to the extent those costs are reasonable. *See* 42 C.F.R. § 413.30(f)(1). Where the governing regulation is silent on the issue, analysis under *Christensen* determines the degree of deference due to the Secretary's attempt to speak to the issue through an interpretive rule. *See Christensen,* 529 U.S. at 587, 120 S.Ct.

**15.** The Eighth Circuit has consistently construed the PRM "to contain only nonbinding interpretive rules that have not been subjected to APA rulemaking procedures." *In Home Health, Inc.,* 188 F.3d at 1047; *accord Hennepin County Med. Ctr.,* 81 F.3d at 748; *Sioux Valley Hosp.,* 792 F.2d at 720 n. 6 (describing PRM as "opinion of the agency" which is

"accorded less deference than substantive rules") (citations omitted). While St. Luke's contests the validity of this characterization as an alternative basis for summary judgment, the Court shall assume for purposes of the substantive challenge addressed in this section that PRM § 2534.5 is what it purports to be—a nonbinding interpretive rule.

1655 (observing that *Chevron* deference would apply to an agency interpretation *contained in* a regulation "[b]ut in this case the Department of Labor's regulation does not address the issue [in dispute]").[16] *See also, e.g., Mead*, 533 U.S. 218, 121 S.Ct. 2164 (applying *Christensen* to tariff classification ruling by U.S. Customs Service and finding *Chevron* deference inapplicable although tariff ruling was eligible, under *Skidmore*, "to claim respect according to its persuasiveness"); *McMenemy v. City of Rochester*, 241 F.3d 279, 284 (2d Cir.2001) (applying *Christensen* to interpretations of Title VII contained in EEOC Compliance Manual provisions); *Miller v. AT & T Corp.*, 250 F.3d 820, 832 (4th Cir.2001) (applying *Christensen* to FMLA interpretation contained in Department of Labor opinion letter); *Henrikson*, 249 F.3d at 398 (applying *Christensen* to statutory interpretation contained in Bureau of Prisons program statement); *Echevarria*, 256 F.3d at 629–30 (applying *Christensen* to HUD opinion letters and information booklet interpreting regulatory language); *Friends of Richards–Gebaur Airport v. F.A.A.*, 251 F.3d 1178, 1186 (8th Cir.2001) (applying *Christensen* to FAA Order contained in Airport Environmental Handbook which purported to interpret statute and regulation); *Grassi v. Hood*, 251 F.3d 1218, 1220 (9th Cir.2001) (applying *Christensen* to Bureau of Prisons program statement); *Bellas v. CBS, Inc.*, 221 F.3d 517, 530 (3d Cir.2000) (applying *Christensen* to ERISA interpretations contained in IRS General Counsel Memorandum); *Falvo v. Owasso Ind. School Dist. No. I–011*, 233 F.3d 1203, 1214 (10th Cir.2000) (applying *Christensen* to interpretation of Family Education Rights & Privacy Act contained in opinion letter and sworn declaration of Department of Education's division director); *Pitsker v. Office of Personnel Management*, 234 F.3d 1378 (Fed.Cir.2000) (applying *Christensen* to informal interpretation of disability retirement statute by Office of Personnel Management).

■■■■ Applying *Christensen* and *Skidmore* to the case at bar, the Court concludes that the Secretary's interpretation of 42 C.F.R. § 413.30, as articulated in PRM § 2534.5, is entitled to little deference in the Court's reasonableness review. PRM § 2534.5 was not developed contemporaneously with 42 C.F.R. § 413.30 nor, for that matter, with 42 U.S.C. § 1395yy. The regulation was issued in 1974 while the statute was enacted in 1984. Thus, for nearly ten years following establishment of the two-tier statutory RCLs, the Secretary consistently interpreted the § 413.30 exceptions process to measure HB–SNF exceptions from the statutory RCL—not from a point significantly above it. Further, PRM § 2534.5 represents a stark change in the Secretary's previous, long-

---

16. In *Christensen*, the agency alternatively argued that its interpretation of the regulation at issue, as embodied in an opinion letter, should be given deference under *Auer v. Robbins*, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), in which the Supreme Court held that an agency's interpretation of its own regulation is entitled to deference. *See id.* at 461, 117 S.Ct. 905. In rejecting this argument, the *Christensen* Court stated that "*Auer* deference is warranted only where the language of the regulation is ambiguous." *Christensen*, 529 U.S. at 588, 120 S.Ct. 1655. Because, in this case, as in *Christensen*, there is nothing ambiguous in the text of the regulation itself, this Court concludes that *Auer* deference is similarly unwarranted here. *See, e.g., Henrikson v. Guzik*, 249 F.3d 395, 399 (5th Cir.2001) (finding statutory provision at issue unambiguous so Bureau of Prisons informal interpretation entitled to no extra deference above that warranted under *Christensen*); *Echevarria v. Chicago Title & Trust Co.*, 256 F.3d 623, 2001 WL 748073, *4–5 (7th Cir.2001) (finding regulation at issue unambiguous so HUD opinion letters and special informational booklet entitled to no extra deference under *Auer* exception).

held position as to the meaning of the regulation. *See Sioux Valley Hosp.,* 792 F.2d at 719–20 (finding inconsistent interpretation relevant to determination that Secretary's PRM provision not entitled to deference). This Court does not question an agency's authority to reevaluate an existing interpretation. *See Smiley v. Citibank,* 517 U.S. 735, 742, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) ("Of course the mere fact that an agency interpretation contradicts a prior agency position is not fatal."); *Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) ("The Secretary is not estopped from changing a view she believes to have been grounded upon a mistaken legal interpretation."); *but see Alaska Prof'l Hunters Ass'n v. FAA,* 177 F.3d 1030 (D.C.Cir.1999) (holding that an agency may not change a consistently long-followed permissible interpretation of its regulation without providing an opportunity for notice and comment); *Shell Offshore, Inc. v. Babbitt,* 238 F.3d 622 (5th Cir.2001) (adopting D.C. Circuit rule regarding long-held interpretations). *Christensen* makes clear, however, that a change in a long-followed permissible interpretation is a potentially weighty factor in the deference analysis. *See also Good Samaritan Hosp.,* 508 U.S. at 417, 113 S.Ct. 2151 ("[T]he consistency of an agency's position is a factor in assessing the weight that position is due."); *Thomas Jefferson Univ.,* 512 U.S. at 515, 114 S.Ct. 2381 ("[A]n agency's interpretation of a statute or regulation that conflicts with a prior interpretation is 'entitled considerably less deference' than a consistently held agency view.") (quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).

Finally, the Secretary's explanation for the change in interpretation fails to persuasively evince the thorough and reasoned consideration that would warrant substantial deference on review. In sup-port of PRM § 2534.5, the Secretary relies on Congressional intent as manifested in 42 U.S.C. § 1395yy's implementation of a two-tier RCL system and related HCFA studies which allegedly show HB–SNF inefficiency. The Secretary has proffered no explanation for his ten year delay in correcting the "error" in the original interpretation. As to the HCFA studies themselves, the Court notes several points of concern regarding the Secretary's purported reliance on them. First, the HCFA report detailing its findings was not issued until January 1985, six months after the two-tier RCL structure of 42 U.S.C. § 1395yy was enacted in July, 1984. Thus the assertion that Congress relied upon the report's findings in enacting the statute is open to doubt. Second, the Court has reviewed the HCFA report included in the record in its entirety and agrees with St. Luke's that it cannot be reasonably read to affirmatively conclude that the "unexplained" variance between FS– and HB–SNF costs is due to HB–SNF inefficiency. While the report does suggest that at least 50 percent of the variance is due to casemix differences, it candidly acknowledges that the methodologies in effect at the time of the studies yielded inconsistent results and precluded accurate assessment of the contributing factors to the cost differences. *See, e.g.,* HCFA Report to Congress: "Study of the Skilled Nursing Facility Benefit Under Medicare," at 12 (Jan., 1985) ("Sufficient information is currently not available to definitively quantify the proportion of the existing cost differences that can be attributed to the various factors such as unmeasured casemix, quality of care, and inefficiency."); *id.* at 13 ("The Department conducted a thorough analysis of internal administrative data, reviewed existing literature and commissioned outside studies to provide the most complete picture currently available on the Medicare SNF industry. Our analysis of the available information indicates, however, that

important issues need to be considered before specific options for reimbursement reform of the Medicare SNF benefit can be addressed."); *id.* ("A key issue is that no reliable and valid patient specific casemix measure presently exists for Medicare SNF patients."); *id.* at 85 ("Still more data are necessary to make patient-specific casemix adjustments for the reimbursement of SNFs under Medicare. Additional information is required both to develop direct casemix measures and to determine precisely the relationship between casemix and costs in Medicare participating SNFs."); *id.* at 96 ("Differences in costs across facilities participating in the Medicare SNF program reflect casemix differences, but could also reflect their ability to provide care efficiently. The information necessary to produce definitive answers is currently not available."); *id.* at 108 ("The unavailability of routinely collected data on patient disability and specialized treatments precludes a definitive assessment of the casemix differences between hospital-based and freestanding SNFs under Medicare."); *id.* at 151 ("While the research results presented in this report have described the state of knowledge on the relationships between casemix and resource consumption of Medicare SNF patients, it is clear that further work is required.").

In sum, the Court concludes that, in this case, the Secretary's interpretation of the regulatory exceptions process is not entitled to heightened deference under *Skidmore* and Eighth Circuit precedent notwithstanding the Secretary's specialized skill in implementing the complex Medicare Act. PRM § 2534.5 represents an abrupt and significant alteration of a long-standing, consistently followed policy and was developed years after the regulation it interprets and the statute it purports to incorporate. The Secretary has failed to persuade this Court that despite its incongruous and inconsistent procedural history, the interpretation is the product of

"thorough and reasoned consideration." *See In Home Health,* 188 F.3d at 1046 (finding Secretary's interpretation of Medicare provision invalid in part because interpretation which further limited the statutory term "employment relationship" was "not supported by ... the Secretary's contemporaneous interpretation as reflected in the 1992 regulation"); *Bowen,* 792 F.2d at 719–20 (finding no deference due to PRM provision where considerable confusion resulted from inconsistent interpretation).

3. *Is PRM § 2534.5 an unreasonable interpretation of 42 C.F.R. § 413.30?*

■ In light of the above, the Court now turns to a relatively independent analysis of the reasonableness of PRM § 2534.5 and finds it invalid. In so doing, the Court does not discount the broad discretion granted the Secretary under 42 U.S.C. §§ 1395x(v)(1)(A) and 1395yy(c). Nor does the Court suggest that the Secretary is not entitled to consider subsequently-enacted statutory provisions to ensure that the interpretation of existing regulations evolves in harmony with Congressional pronouncements as to other parts of the Medicare Act. Rather, the Court concludes that in this instance the Secretary's attempts to exercise his discretion and authority through PRM § 2534.5 cannot be deemed reasonable in light of the language of the governing regulation as well as the principles underlying the Medicare Act.

■ Before explaining the above conclusions, the Court will briefly address the Secretary's "macro" argument that given the broad discretion granted him under 42 U.S.C. § 1395x(v)(1)(A) to promulgate standards for determining reasonable costs, PRM § 2534.5 must be deemed a valid exercise of that discretion. This argument is untenable given the plain language of the statute which grants the Sec-

retary discretion to establish *by regulation* "the method or methods to be used, and the items to be included" in determining "reasonable costs." *See id.* As already discussed, PRM § 2534.5 is not a regulation, and it would obviate the language of § 1395x(v)(1)(A) if the substantive parameters of the Secretary's discretion under that section could be defined without regard to the formal rule making procedures of the APA. *See* discussion, *supra* (noting distinction between formal and informal rules in purpose, treatment and effect). Thus, PRM § 2534.5 is not a direct exercise of the Secretary's broad discretion in 42 U.S.C. § 1395x(v)(1)(A). Rather, it is an interpretation of 42 C.F.R. § 413.30, a regulation which predates the PRM provision by nearly twenty years. Accordingly, the relevant inquiry is whether PRM § 2534.5 is a reasonable interpretation of that regulation in light of its language and the principles underlying the Medicare Act. Pursuant to this inquiry, the Court will look first to the Secretary's contention that PRM § 2534.5 applies Congressional intent as manifested in the subsequently-enacted 42 U.S.C. § 1395yy. The Court will then review the Secretary's argument that PRM § 2534.5 merely "fleshes out" the regulation's "reasonableness" limitation and "atypicality" requirement. And finally, the Court will address the cross-subsidization concerns raised by St. Luke's.

(a) The two-tier RCL of 42 U.S.C. § 1395yy cannot be read directly into 42 C.F.R. § 413.30.

The Secretary first argues that PRM § 2534.5 merely incorporates Congress' determination in 42 U.S.C. § 1395yy that there are inherent inefficiencies in HB–SNFs that should never be recoverable. The Secretary contends that in enacting 42 U.S.C. § 1395yy(a), Congress declared that only 50% of the variance between FS— and HB–SNFs can be attributed to legitimate factors and thus only that portion should be reimbursed as "necessary in the efficient delivery of needed health care." *See* 42 C.F.R. § 413.30(f)(1)(ii). According to the Secretary, PRM § 2534.5 applies this legislative determination to the exception process so that exception eligibility is considered only where a provider's costs exceed the outer bounds of the inefficiency gap. Otherwise, HB–SNFs would be able to avoid the statute's RCL "cap" by using the exception process to back-door inefficient costs into the reimbursement process.

The Court finds this reasoning flawed for several reasons. First and foremost, the Secretary's contention that by lowering the RCL for HB–SNFs in 42 U.S.C. § 1395yy(a) Congress did not intend to leave an alternative avenue for those entities, in certain circumstances, to receive reimbursement for the amount below 112% of the peer group mean disregards the explicit distinction in 42 C.F.R. § 413.30 between costs subject to routine cost limits and those eligible for exception under subsection (f)(1). Section 413.30(f)(1) recognizes the need for discretion to allow for reimbursement in those cases where routine cost limits are exceeded *because* a provider takes on special needs patients requiring atypical services. There is nothing in the language of 42 C.F.R. § 413.30 or 42 U.S.C. § 1395yy which suggests that Congress did not intend for this exceptions process to exist and continue.[17] Further,

---

17. Although the Court concludes that the dearth of on-point legislative history renders that history unhelpful in this case, it notes that what little legislative history there is supports St. Luke's position. Discussing imple-

mentation of 42 U.S.C. § 1395yy's new RCL structure, the Senate Committee on Finance explained:

Under this provision, both hospital-based and freestanding facilities could continue to

the Secretary's reasoning presumes that 42 U.S.C. § 1395yy and 42 C.F.R. § 413.30 play the same role in administering the Medicare Act. But the two provisions address significantly distinct concerns. The statute establishes the formula for determining routine cost limits for the provision of typical services while the regulation provision at issue expressly provides for a discretionary *exception* to those cost limits where, for reasons deemed important in the delivery of health care services, an SNF provides *atypical services* to special needs patients. It does not follow that Congress' findings or conclusions with regard to the former necessarily apply to the latter, and, in fact, the converse is more likely. Given the distinctions between 42 C.F.R. § 413.30(f) and 42 U.S.C. § 1395yy, the more reasonable conclusion to be drawn from Congress' silence regarding the effect of the statute on the pre-existing regulation is that the two are not interrelated for reimbursement purposes. *Cf. Christensen,* 529 U.S. at 590 n. *, 120 S.Ct. 1655 (Scalia, J., concurring in part and concurring in judgment) ("The implausibility of Congress' leaving a highly significant issue unaddressed (and thus 'delegating' its resolution to the administering agency) is assuredly one of the factors to be considered in determining whether there is ambiguity . . .").

The Court finds equally unpersuasive the Secretary's related contention that exclusion of the "gap" costs is appropriate because all costs contribute to a provider's total costs and therefore exceptions-eligi-

ble costs cannot be neatly separated from the typical service costs expressly subject to the RCL cap. This somewhat circular reasoning again ignores the explicit distinction recognized in 42 C.F.R. § 413.30(f)(1) for atypical service providers. The structure of § 413.30 contemplates a two-tiered reimbursement process: up to the RCL for typical costs and reimbursement above the RCL only where the provider meets exception eligibility benchmarks as established under § 413.30(f). Only those costs incurred *because* necessary atypical services were provided to special needs patients are eligible for reimbursement. This "cause-and-effect" requirement addresses the very concern that the Secretary raises and reflects the inherent gatekeeping procedure contained within the regulation itself to prevent the "melding" of typical and atypical costs for purposes of exception reimbursement. *See In Home Health,* 188 F.3d at 1046 (noting explicit distinction in text of statute and regulation that undercuts Secretary's attempt to treat employee therapists and independent contractor therapists similarly for reimbursement purposes). In sum, nothing in the language of 42 U.S.C. § 1395yy suggests that it was intended to apply to the exception process of 42 C.F.R. § 413.30 and the Court concludes that distinctions between the two in language and purpose are too significant to support the Secretary's attempt to directly read the former into the latter.

apply for and receive exceptions from the cost limits in circumstances where high costs result from more severe than average case mix or circumstances beyond the control of the facility. Indicators of more severe case mix include a comparatively high proportion of medicare days to total patient days, comparatively high ancillary costs, or relatively low average length of stay for all

patients (an indicator of the rehabilitative orientation of the facility). Facilities eligible for exceptions could receive, where justified, up to all of their reasonable costs. Senate Committee on Finance, 98th Cong., "Deficit Reduction Act of 1984: Explanation of Provisions Approved by the Committee on March 21, 1984," S.Prt. No. 98–169, at 948 (2d Sess.1984).

(b) PRM § 2534.5 does not reasonably "interpret" language in 42 C.F.R. § 413.30(f).

The Secretary next contends that PRM § 2534.5 "interprets" language within the regulation—namely, the reasonableness limitation of § 413.30(f) and the "atypicality" requirement of subsection (f)(1). Again the Court disagrees. First, the Court does not find persuasive the Secretary's attempt to use the inherently vague reasonableness limitation of § 413.30(f) to impose an additional significant substantive benchmark onto the exceptions eligibility. In the words of one court, to give effect to agency interpretations of amorphous regulatory or statutory language would "make a mockery of ... the APA" which was designed to enable an agency to use a carefully devised procedure to convert vague statutory and regulatory standards into a reasonably clear set of rules. *See Mission Group Kansas, Inc. v. Riley,* 146 F.3d 775, 782 (10th Cir.1998). *See also* Richard J. Pierce, Jr., *"Distinguishing Legislative Rules From Interpret[ive] Rules,"* 52 Admin.L.Rev. 547, 558–561 (Spring 2000) (discussing court holdings that agencies cannot issue interpretive rules to provide the "real content" to vague and open-ended legislative rules) (citing, e.g., *United States v. Picciotto,* 875 F.2d 345, 348 (D.C.Cir.1989) (Park Service could not informally "interpret" open-ended phrase "additional reasonable conditions" to mandate a specific condition); *Pearson v. Shalala,* 164 F.3d 650, 660–61 (D.C.Cir.1999) (invalidating an FDA rule on ground that it lacked adequate definitional content); *Mission Group Kansas,* 146 F.3d 775 (stating that Secretary of Education's interpretation of "entirely unrestricted" was improper)); Robert A. Anthony, "Interpretive Rules, Policy Statements, Guidance, Manuals, and the Like—Should Federal Agencies Use Them to Bind the Public?" 41 Duke L.J. 1311, 1325 n. 62 (citing cases for proposition that "[a] rule that purported to interpret a vacuous statutory term like 'just and reasonable' or 'public interest, convenience and necessity' would not be interpretive; if it were issued by legislative rulemaking it would be a legislative rule, but if not, such a rule would be a policy statement"). *Cf. Thomas Jefferson Univ.,* 512 U.S. at 517, 114 S.Ct. 2381 (where "language in question speaks *not of vague generalities but in precise terms,*" the Secretary was "well within her discretion to interpret this language as imposing a substantive limitation on reimbursement").

To conclude otherwise and include PRM § 2534.5's irrebuttable exclusion of gap costs within the "reasonableness" filter of 42 C.F.R. § 413.30(f) would result in a clear case of "the tail wagging the dog." It would allow the Secretary to substantively rewrite the regulation to impose an additional hurdle for exceptions eligibility not clearly contemplated by the language of 42 C.F.R. § 413.30(f) or subsequently enacted statutes. *See, e.g., Christensen,* 120 S.Ct. at 1663 (rejecting agency interpretation that limited scope of regulatory language because "[t]o defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation"). The Eighth Circuit has previously found invalid the Secretary's imposition of implied substantive requirements, even when applying the deferential *Chevron* standard. In *Shalala v. St. Paul–Ramsey,* 50 F.3d 522 (8th Cir.1995), the Court of Appeals found the Secretary's interpretation of a PRM provision "to contain an unwritten but implied independent verification requirement ... 'plainly erroneous or inconsistent' with the text" of the PRM.[18] *Id.* at 528. At

---

**18.** The *St. Paul–Ramsey* court noted that normally PRM provisions are considered non-binding and hence subject to less deference. *See id.* at 527 n. 4. *However, because all*

issue was the Secretary's denial of Medicare bad debt reimbursement based on her interpretation of a PRM provision requiring providers to determine patients' indigency status. The Secretary interpreted the PRM to require additional independent verification from that provided by the patient and denied reimbursement where the hospital had assessed indigency based only on the latter source. The court rejected the Secretary's attempt "to impose additional unstated and unwritten requirements pertaining to the nature and quality, i.e., verification, of the information used for the indigency determination—not who ultimately makes the determination." *Id.* The court found that the PRM was "absolutely silent on that issue and [did] not support an interpretation which imposes an additional implied verification requirement." *Id. See also Ohio Dep't of Health v. Dep't of Health & Human Svcs.*, 862 F.2d 1228 (6th Cir.1988) (finding invalid an interpretive rule which added a requirement that was not compelled by or implicit in the existing regulations); *Linoz v. Heckler*, 800 F.2d 871, 877 (9th Cir.1986) (finding invalid an interpretive rule which "instead of simply clarifying a pre-existing regulation, carved out a per se exception"); *Guardian Fed. Sav. & Loan Ass'n v. Federal Sav. Loan Ins. Corp.*, 589 F.2d 658, 666–67 (D.C.Cir. 1978) ("If it appears that a so-called policy statement is in purpose or likely effect one that narrowly limits administrative discretion, it will be taken for what it is— a binding rule of substantive law.").

Also instructive is *In Home Health, Inc. v. Shalala*, in which the Eighth Circuit invalidated the Secretary's interpretation of physical therapy reimbursement practices for Medicare providers. 188 F.3d 1043 (8th Cir.1999). The statute and reg-

ulation at issue provided that physical therapy services furnished under "an arrangement" with a provider would not be reimbursed in excess of the salary which would reasonably have been paid for such services had they been performed in an "employment relationship." *See id.* at 1044. Thus, in-house employee-provided services were reimbursed at their full rate but independent contractor-provided services were subject to strict curtailment under "Guidelines" published by the Secretary to establish the "reasonable salary." *See id.* at 1045. In Home Health used its own employees to provide physical therapy services but paid them on a "per visit," rather than "salaried," basis. *See id.* When In Home Health applied for reimbursement of its employee-provided services, a significant portion was disallowed on the ground that the employees' "per-visit" compensation agreement subjected those employees to the same Guideline limitations as outside contractors. *See id.* The Secretary took the position that only salaried employees were in an "employment relationship" for reimbursement purposes, and argued on appeal that her interpretation was entitled to considerable deference. *See id.* at 1046.

The Eighth Circuit held that neither the statute nor the regulation provided a basis for the Secretary's application of the Guidelines to In Home Health's employee physical therapists regardless of the fact that they were paid on a per-visit basis. *See id.* The court noted the explicit distinction in the statute and regulation between treatment of in-house and outside therapists and stated that the "Secretary's attempt to now further limit the term 'employment relationship' to mean only salaried employees is not supported by the

parties had treated the PRM in question as a binding requirement and the only method for reimbursement, the court reviewed the Secre-

tary's interpretation with substantial deference. *See id.*

statute or the Secretary's contemporaneous interpretation as reflected in the 1992 regulation." *Id.* at 1047. The court rejected the Secretary's reliance on the Provider Reimbursement Manual to support her Guidelines position. Noting the nonbinding character of the PRM, the court held that "[t]o the extent the PRM supports the Secretary's view that paid per-visit employees are subject to the Guidelines, we conclude that this agency interpretation is contrary to the plain language of the statute . . . [and] cannot defer to the Secretary's interpretation." *Id.*

Applying this precedent to the case at bar, the Court agrees with St. Luke's that PRM § 2534.5, like the Secretary's interpretation in *St. Paul–Ramsey,* imposes an additional substantive requirement that cannot reasonably be found in or inferred from the text of 42 C.F.R. § 413.30. And as in *In Home Health, Inc.,* PRM § 2534.5 attempts to significantly narrow the scope of (f)(1) exception-eligibility in contravention of any reasonable reading of the regulation and the Medicare Act. Section 413.30(f)(1) establishes tangible requirements for discretionary exception eligibility and the Secretary has properly fleshed-out those tangible benchmarks through the PRM—each of which directly clarifies language in the regulation by further defining an "atypical service provider" and "atypical services." PRM § 2534.5 does something quite different. It imposes an additional substantive threshold burden on the providers before they can be deemed eligible for a discretionary exception reimbursement. And unlike the others, this requirement has nothing to do with determining which providers are or are not atypical service providers, or whether or not the services provided are or are not atypical. In fact, by design, it deems any such distinctions completely irrelevant. Thus, a provider who has proven that it meets the eligibility standards of 42 C.F.R. § 413.30(f)(1) is nevertheless ineligible to apply for reimbursement of "actual costs." The PRM removes all discretion from the Secretary to consider reimbursement in those circumstances. To place this wholesale irrebuttable presumption of unreasonableness on all costs incurred within the gap, regardless of the nature of those costs, cannot be deemed merely "fleshing out" terms of the regulation. *See St. Francis Health Care Centre,* 205 F.3d at 949 (Gilman, J., dissenting opinion) ("At a minimum, the PRM rule adds a fifth, unwaivable requirement to the four reimbursement criteria set out in 42 C.F.R. § 413.30. At a maximum, the PRM conflicts with the prior regulation.").

Finally, as this Court reads the record, there already exist myriad detailed rules properly promulgated by the Secretary to distinguish between typical and atypical costs that serve to weed out unreasonable costs from the reimbursement process. Based on these rules, St. Luke's failed to qualify or received limited relief in accordance with exception requests for numerous indirect costs centers. For example, under HCFA "filtering" guidelines, St. Luke's could only justify an exception of $3.37 per day for "Employee Health and Welfare Costs" even though its costs in this line item exceeded the disaggregated RCL by $6.05; for "Administrative and General" costs, St. Luke's could justify an exception of only $4.49 per day, even though its costs in this line item exceeded the RCL by $6.51; and for "Cafeteria" costs, St. Luke's could justify an exception of only $1.07 per day even though its costs in this line item exceeded the RCL by $2.10. These adjustments represent application of appropriate HCFA implementing authority under the regulation. In contrast to the rule at issue in this case, they are narrow in scope and tailored to address discrete concerns about inefficiency.

(c) PRM § 2534.5 violates the cross-subsi-dization prohibition.

■ A final concern raised by PRM § 2534.5 is its potential conflict with the Medicare Act's explicit policy prohibiting cross-subsidization. *See* 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. §§ 413.5(a) and b(3); 42 C.F.R. § 413.50. Under that policy, "[a] central consideration of the Medicare reimbursement program is that 'reasonable costs' are calculated so that non-Medicare payors do not subsidize the care of Medicare patients." *Sioux Valley Hospital*, 792 F.2d at 721 (citation omitted). In this respect, PRM § 2534.5 is problematic because a provider with typical costs that fall within the RCL but that exceeds the RCL only *because* it provides necessary atypical services is nevertheless precluded from reimbursement for those services within the gap. Rather, the Secretary applies an irrebuttable presumption that such costs are not reasonable. Thus, non-Medicare recipients bear the full brunt of all costs incurred within the gap even though had those same services been provided to the same patients above or below the gap they would be reimbursable. The Court finds this irrebuttable presumption unreasonable in light of the Medicare Act's explicit prohibition on cross-subsidization. *See Sioux Valley Hospital*, 792 F.2d at 720–21 (finding Medicare prohibition on cross-subsidiza-tion integral in invalidating a PRM inter-pretation of "routine costs" in labor/deliv-ery room treatment).

### IV. *Conclusion*

Upon applying the appropriate level of deference under *Christensen*, the Court finds that PRM § 2534.5 is an unreason-able interpretation of the exception eligi-bility process of 42 C.F.R. § 413.30. The Court does not agree that 42 U.S.C. § 1395yy, read in conjunction with 42 C.F.R. § 413.30, reasonably results in the interpretation promulgated by the Secre-tary in PRM § 2534.5. There is no inher-ent conflict between the Secretary's origi-nal, longstanding interpretation of 42 C.F.R. § 413.30 and Congress' subsequent imposition of a two-tiered RCL measure through 42 U.S.C. § 1395yy. Absent per-suasive evidence to the contrary, there is no reason to believe that Congress, in en-acting 42 U.S.C. § 1395yy, meant to over-ride the distinction between typical and atypical service reimbursement eligibility explicitly recognized in 42 C.F.R. § 413.30. Nor does the discretionary language with-in 42 C.F.R. § 413.30 save the Secretary's PRM interpretation. When read as a whole, that language does not reasonably support the irrebuttable exclusion of other-wise potentially reimbursable costs within the gap, particularly in light of the cross-subsidization concerns raised by such a wholesale exclusion.[19]

**19.** The Court recognizes that this holding is contrary to that reached by the Court of Ap-peals for the Sixth Circuit when faced with the same issue in *St. Francis Health Care Centre*. 205 F.3d 937. Little can be gleaned from this apparent conflict, however, in light of the different standards of review applied by each court. The Sixth Circuit's decision pre-dates *Christensen* by over two months and thus that court reviewed PRM § 2534.5 under the substantial deference standard of *Chevron*. *See St. Francis Health Care Centre*, 205 F.3d at 943–45 ("[C]ourts are to 'give substantial def-erence to an agency's interpretation of its own regulations.' ") (quoting *Thomas Jeffer-son University*, 512 U.S. at 512, 114 S.Ct. 2381, and citing *Martin*, 499 U.S. at 151, 111 S.Ct. 1171, and *Harris*, 64 F.3d at 221 ("The Secretary's interpretation of Medicare regula-tions is given controlling weight unless it is plainly erroneous or inconsistent with the reg-ulation.")). There appears no question that after *Christensen* such extreme deference to an interpretive rule is the exception and not the rule. Guided by *Christensen*, this court accorded the Secretary's interpretation much less deference and ultimately found it unper-suasive. Because such contrasting standards of review were applied, the difference in con-clusion reached by this Court and the Sixth

Because the Court concludes that PRM § 2534.5 represents an unreasonable interpretation of 42 C.F.R. § 413.30, it is invalid as applied to St. Luke's exception request.[20] The parties have stipulated that, in the absence of the gap methodology at issue here, St. Luke's had met all benchmarks indicating exception eligibility under 42 C.F.R. § 413.30(f)(1). Accordingly, St. Luke's is entitled to reimbursement of all eligible costs above the statutory RCL for FYE 1992.

### *ORDER*

For the reasons stated herein, it is ORDERED:

St. Luke's Methodist Hospital's motion for summary judgment (doc. no. 15) is GRANTED and the Secretary's cross-motion is DENIED.

Circuit is neither irreconcilable nor particularly surprising.

**20.** Having so concluded, the Court need not address St. Luke's alternative argument that PRM § 2534.5 is, in substance, a "legislative rule" which was invalidly promulgated without adherence to the APA's formal rule making procedures.